**SEIDEN et al. v. LARSON et al.**
No. 10596.

United States Court of Appeals
District of Columbia Circuit.

Decided March 15, 1951.

Writ of Certiorari Denied June 4, 1951.

See 71 S.Ct. 1017.

Norman Winer, New York City, of the Bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Wallace M. Cohen, Washington, D. C., was on the brief, for appellants.

Roger P. Marquis, Attorney, Department of Justice, Washington, D. C., with whom Asst. Atty. Gen., A. Devitt Vanech was on the brief, for appellees. George Morris Fay, U. S. Atty., and Joseph M. Howard, Asst. U. S. Atty., Washington, D. C., also entered appearances for appellees.

Before EDGERTON, PROCTOR and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

This case involves an effort by former owners of real property, taken by the Government for war purposes, to reacquire it on a priority basis. The claim of plaintiffs (appellants) is based on section 23(d) (1) (A) of the Surplus Property Act of 1944[1] which provided, in substance, that former owners of "surplus real property * * * shall be entitled to purchase such property * * * at private sale * * *."

The property here involved has been declared to be surplus. But the appellees, who are officials of the General Services Administration (successor to the remaining functions of the War Assets Administration), have determined that it is not "real property" within the meaning of section 23(d) because it is war housing, excluded from the coverage of section 23(d) by the provisions of section 23(a) of the Act. Accordingly, appellees have refused to recognize appellants' claim of priority and have offered the property for public sale.

I.

On a 169 acre tract at Lido, Long Island, appellants owned and operated a resort, comprising a hotel, a golf course, swimming pools, an ocean beach and other accommodations. The Secretary of the Navy

1. 50 U.S.C.A.Appendix, § 1632(d) (1) (A), Act of Oct. 3, 1944, c. 479, § 23, 58 Stat. 777. For repealer provisions, see footnote 8, infra.

took possession of the entire tract on September 8, 1942, and formal condemnation proceedings were completed in 1945, when the United States took title and paid the sum due. The property was converted into the Lido Naval Training Station.[2] After the termination of hostilities, in May, 1947, the entire property was declared surplus, and was turned over to the War Assets Administrator for disposition. In November of that year the hotel site (the south 54½ acres of the tract) was sold to the appellants on a priority basis. All of the remaining property (115 acres in the northern part of the tract, encompassing primarily the former golf course) has been classified as "Non-Section 23" real property, i. e., as not within the statutory former-owner preference.

While appellants have objected to this classification as to the entire 115 acres, only a portion of the property is here in issue.[3] It is a 79 acre tract now occupied, in part, by veterans' emergency housing built by New York State.[4] Appellants have negotiated at length with appellees in an attempt to reacquire this tract, but appellees have refused to change its classification as "Non-Section 23" real property.

On December 21, 1949, appellees advertised the 79 acres of property for sale to the public, "subject to existing occupancy of 23.8 acres for veterans' emergency housing until September 30, 1954." The appellants responded to this advertisement by submitting a bid. They also brought suit in the United States District Court for the District of Columbia on December 29, 1949, to restrain the appellees from disposing of the property to anyone other than the appellants. On March 7, 1950, the District Court granted appellees' motions to dismiss the complaint and for summary judgment.[5] It is from this judgment that appeal is taken.

## II.

■ In cases of this sort, where the plaintiff challenges action by an administrative official relative to Government property, two questions are commonly posed at the outset: (1) Does the plaintiff have standing to sue, and (2) is the suit actually one against the United States, to which it has not consented? These questions are of necessity closely inter-related, and in fact they sometimes blend together. For if the suit is one against the United States

2. The structures already on the property were utilized by the Navy, and in addition, some $4,000,000 was spent by it in the construction of a number of barracks, administrative buildings, warehouses, target ranges, and the like.

3. After the entire property had been declared surplus, some 35.8 acres of the northern tract were transferred by the War Assets Administrator to the Hempstead School District for educational purposes on or about September 19, 1949, pursuant to the provisions of section 13 of the Surplus Property Act of 1944, 50 U.S.C.A.Appendix, § 1622. While appellants object to that transfer, it is not involved in the instant proceedings.

4. Briefly, its history is as follows: Prior to declaring the entire property surplus, on October 26, 1946, the Navy Department issued a permit under Title V of the Lanham Act, as amended, [42 U.S. C.A. § 1572(b)] to the Federal Public Housing Authority, covering this part of the property. The Federal Public Housing Authority thereupon entered into a contract with the New York State Division of Housing for the use of this land by the latter, for veterans' emergency housing. The permit from the Federal Public Housing Authority to the State authorities will expire on September 30, 1954. The State Division of Housing rebuilt certain of the structures put up by the Navy so as to make them usable as housing facilities. Twenty-three barracks buildings of cinder block construction were divided into family units with appropriate entrances, plumbing fixtures, and staircases. New York State spent some $500,000 in converting the barracks buildings for family use. The housing project is still in operation, and is tenanted by a large number of families on a low rental basis.

The buildings in the project cover an area of some 23.8 acres. The 79 acres, however, have been treated as a unit and appellants have not, so far as the record before us shows, suggested that this was improper in that the 23.8 acres should be considered separately. A single determination as to the entire 79 acres has been sought.

5. An injunction was granted pending appeal.

and no consent to its maintenance has been given, it is clear that no one is entitled to sue, and the extent of the plaintiff's interest in the matter is immaterial.[6] If the suit is not against the United States, the nature of the plaintiff's interest becomes relevant; the courts must decide whether that interest is such as to entitle him to judicial protection against the conduct of which he complains, on the part of the individual defendant he has sued.[7]

 In the present situation appellants rely on section 23(d) of the Surplus Property Act, which provided that former owners of "surplus real property * * * *shall be entitled* to purchase such property * * * at private sale * * * *", as giving them standing to maintain this suit.[8] (Emphasis supplied.) There is no doubt that acquisition of the property here involved is of greater practical interest to ap-

pellants as former owners than to ordinary prospective purchasers, and that interests of this sort were recognized by Congress in the quoted provision. But if this suit is against the United States, that is not enough. "When the claims created are against the United States, no remedy through the courts need be provided. * * * To reach the dignity of a legal right in the strict sense, it must appear from the nature and character of the legislation that Congress intended to create a statutory privilege protected by judicial remedies." Stark v. Wickard, 321 U.S. at page 306, 64 S.Ct. at page 569. Since no such intent was manifested in the Surplus Property Act, either expressly or by implication,[9] appellants have no "legal right" as against the Government. Regardless of what their status may be in some other context, if this is a suit against the United States, it cannot be maintained.

6. If the suit is one against the United States and Congress has expressly consented to its maintenance, the inquiry takes a new form; the courts must decide whether the plaintiff is included in the class authorized by Congress to obtain relief, and whether he has properly pursued the statutory remedy.

At the same time, of course, a Federal constitutional court cannot review administrative action unless there is a "case or controversy" within the meaning of Article III of the Constitution; if this is lacking, even an express statute cannot validly authorize judicial review. Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 253, 55 L.Ed. 246; see, generally, Davis, Standing to Challenge and to Enforce Administrative Action, 49 Col.L.Rev. 759.

7. See Stark v. Wickard, 321 U.S. 288, 304, 64 S.Ct. 559, 88 L.Ed. 733. Persons selling to or buying from the Government are ordinarily said to be without standing to maintain suit against administrative officials to enforce the conditions and methods of sale or purchase established by Congress. Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108; Fulton Iron Co. v. Larson, 84 U. S.App.D.C. 39, 42, 171 F.2d 994, 997, certiorari denied 336 U.S. 903, 69 S.Ct. 489, 93 L.Ed. 1068. This result could equally well be expressed in other terms; the fact is that such matters are not ordinarily reviewed by the courts at the

instance of any plaintiff whatever, no matter how much damage he has suffered.

8. Section 23(d), however, is no longer in effect; section 502 (a) of the Federal Property and Administrative Services Act repealed the Surplus Property Act as of June 30, 1949. Act of June 30, 1949, c. 288, Title VI, § 502 (a), 63 Stat. 399, 400. While priorities as to surplus real property were continued in effect by the new act until December 31, 1949, that date has long since passed. It may well be that after December 31, 1949, appellants lost whatever standing they may theretofore have possessed, notwithstanding their efforts to establish their position prior to that date. Benefits granted by Congress can be withdrawn by Congress. Lynch v. United States (Wilner v. U. S.), 292 U.S. 571, 577, 54 S. Ct. 840, 78 L.Ed. 1434. We are reluctant, however, to decide the case on the narrow basis that appellants' interest has ceased, and that their present status is merely that of a member of the general public.

It may be noted that functions conferred by the Surplus Property Act, 50 U.S.C.A. Appendix, § 1611 et seq., were specifically excluded from the operation of most of the provisions of the Administrative Procedure Act, including the provisions for judicial review. 5 U.S.C.A. § 1001 (a).

## III.

The question whether a suit against an administrative officer named individually is in fact a suit against the United States has long been—and continues to be—a problem of great difficulty. One of the areas where it is most difficult to avoid the conclusion that the suit is in reality against the United States is where Government property is involved. Certainly "a proceeding against property in which the United States has an interest is a suit against the United States." State of Minnesota v. United States, 305 U.S. 382, 59 S.Ct. 292, 294, 83 L.Ed. 235. So too where the proceeding is not directly against the property but will affect the Government's interest in it: State of Minnesota v. Hitchcock, 185 U.S. 373, 22 S.Ct. 650, 46 L.Ed. 954. The Court there held: " * * * the legal title to these lands is in the United States. The officers named as defendants have no interest in the lands or the proceeds thereof. The United States is proposing to sell them. This suit seeks to restrain the United States from such sale, to divest the government of its title and vest it in the state. The United States is therefore the real party affected by the judgment and against which in fact it will operate, and the officers have no pecuniary interest in the matter." 185 U.S. at page 387, 22 S.Ct. at page 655. See, also, State of Oregon v. Hitchcock, 202 U.S. 60, 26 S.Ct. 568, 50 L.Ed. 935. Nor is this reasoning confined to situations where the plaintiff seeks to divest the Government of title. See Naganab v. Hitchcock, 202 U.S. 473, 476, 26 S.Ct. 667, 50 L.Ed. 1113. The Supreme Court, in summing up such decisions, indicated that "where the sovereign admittedly has title to property and is sued by those who seek to compel a conveyance or to enjoin disposition of the property, the adverse claims being based on an allegedly superior equity or on rights arising under Acts of Congress," suit cannot be maintained in the absence of consent on the part of the United States. Land v. Dollar, 330 U.S. 731, 737, 738, 67 S.Ct. 1009, 91 L.Ed. 1209.

In the instant case it is undisputed that the property in question belongs to the United States. Appellants contend, however, that under principles announced in the recent decision of the Supreme Court in Larson v. Domestic & Foreign Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628, this suit can be maintained. We do not think that the Larson decision aids appellants. Unlike the case here at hand, the Larson case was concerned with a situation where plaintiff claimed title, and alleged that the defendant Government official was tortiously withholding *plaintiff's* property. And the Court held that even under those circumstances, " * * * the action of an officer of the sovereign (be it holding, taking or otherwise legally affecting the plaintiff's property) can be regarded as so 'illegal' as to permit a suit for a specific relief against the officer as an individual only if it is not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void." 337 U.S. at page 701–702, 69 S.Ct. at page 1467. The Court did not hold that where Government property was concerned a showing of lack of statutory authority would suffice. To the contrary, it specifically noted that: "Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property." 337 U.S. 682, note 11, 69 S.Ct. 1457.[10]

The reason for this distinction is patent. The Government has a vital interest in the disposition of its property. On the other hand, where a Government official commits a trespass against a citizen's property, and is not acting under valid statutory

10. The Court also noted that the jurisdiction of the District Court would not extend to the granting of a declaratory judgment declaring plaintiff's rights vis- a-vis the United States. 337 U.S. at page 689, note 9, 69 S.Ct. 1457, citing Stanley v. Schwalby, 162 U.S. 255, 16 S.Ct. 754, 40 L.Ed. 960.

authority, "the government is not held to have sufficient interest in the controversy to be considered an indispensable party." Mine Safety Co. v. Forrestal, 326 U.S. 371, 374, 694, 66 S.Ct. 219, 221, 90 L.Ed. 140. Thus, in the words of Mr. Justice Frankfurter: "Of course where the United States is the owner in possession of property a court cannot interfere without the Government's consent." Larson v. Domestic & Foreign Corp., 337 U.S. 682, 725, 69 S.Ct. 1457, 1479, 93 L.Ed. 1628 (dissenting opinion).

Applying these principles to the case at hand, it would seem that appellants' suit must fail; and this would be true even if appellants were correct in their contention that appellees had acted beyond their statutory authority and contrary to congressional mandate. For no one has questioned that the United States has title to the property which is the subject of this suit. The objectives of the suit are to prevent the General Services Administrator from disposing of that property to persons other than appellants and to pave the way for their reacquisition of the property. The court is asked to enjoin appellees from selling the property to anyone other than appellants, from leasing or licensing it in a manner which would deprive appellants of their right to immediate possession, and from classifying the property as "Non-Section 23" real property. While the prayers for relief are expressed largely in negative terms, in substance and in fact the ultimate relief which appellants seek could hardly be obtained without "affirmative action by the sovereign or the disposition of unquestionably sovereign property." Larson v. Domestic & Foreign Corp., supra. Accordingly, this is a suit against the United States.[11]

### IV.

What we have said is perhaps sufficient to dispose of the case. But there is an al-

ternative ground of decision. In the Larson case the Supreme Court made clear that in a suit against a Government official "relief can be granted, without impleading the sovereign, only because of the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient." 337 U.S. 690, 69 S.Ct. 1461. Appellants contend that the Administrator's action was beyond his statutory jurisdiction. We think that in substance appellants' claim amounts to no more than that the Administrator acted erroneously.

The provision in section 23(d) of the Surplus Property Act of 1944 that former owners of "surplus real property * * * shall be entitled to purchase such property, in substantially the identical tract as when acquired from such person, at private sale" was made applicable only to surplus "real property" within the definition given in section 23(a) (1). That definition specifically excluded from the coverage of section 23(d) three very extensive categories: " * * * (A) commercial structures constructed by, at the direction of, or on behalf of any Government agency, (B) commercial structures which the Administrator determines have been made an integral part of a functional or economic unit which should be disposed of as a whole, and (C) war housing, industrial plants, factories, airports, airport facilities, or similar structures and facilities, or the sites thereof, or land which the Administrator determines essential to the use of any of the foregoing * * *."

And Congress gave the Administrator broad power to determine whether property was included within section 23(d), and to classify it on the basis of its highest and best use.[12] In addition, Congress directed the Administrator to consider many facets of public policy. Often, as with the former-owner provision of section 23(d), these di-

11. Lambert v. Reconstruction Finance Corp., D.C., 71 F.Supp. 509; O'Harra v. Littlejohn, D.C., 69 F.Supp. 274; Fulton Iron Co. v. Larson, 84 U.S.App.D.C. 39, 171 F.2d 994, certiorari denied 336 U.S. 903, 69 S.Ct. 489, 93 L.Ed. 1068; Goldberg v. Daniels, 231 U.S. 218, 34 S.Ct. 84, 58 L.Ed. 191.

12. Section 23(c) of the Act provided:
"Immediately after the reporting of surplus real property to the War Assets Administrator under section 11, the War Assets Administrator shall classify such property as agricultural, grazing, forest, mineral, or otherwise, as it may deem advisable. The classification may be revised from time to time. *The classifica-*

rectives were incorporated into the provisions relative to priorities.[13] Under the Surplus Property Act it is apparent that the problem of classifying and disposing of property was one involving a large measure of discretion. Necessarily included in the exercise of the Administrator's discretion in the disposal of property was an interpretation of the objectives of the Act, as well as a fitting of the facts into the various statutory classifications. And the right or privilege given by section 23(d) must thus be placed within its context, in an act of some complexity, where it was but one of many provisions directing the agency administering the Act in the performance of its task.

Here there is no question but that the Administrator had the power, and also a duty, to make a determination as to the best use of the property, and as to whether it was surplus real property covered by section 23(d). The statutory authorization was specific; appellants cannot and do not dispute this. Appellants' argument that the

Administrator was under a statutory duty to sell the property to them rests upon their further contention that the classification of the property as coming within the statutory category "war housing * * * or similar structures and facilities," thus removing it from the former owner priority provisions, was erroneous and arbitrary.

■■ We do not think the action taken by appellees was unreasonable. The statutory background of appellees' determination makes clear that "war housing" was not a narrow technical term confined to projects built pursuant to a single statute.[14] Further, Congress did not restrict the exemption to "war housing." On the contrary, section 23(d) referred to "war housing * * * or similar structures and facilities," indicating congressional intent not only to attach broad meaning to the term but also to supplement it by a further wide category of comparable projects. Housing constructed to fill the needs produced by demobilization would appear, on the face of it, to be such a comparable project. When

*tion of property by the Administrator (including the determination of whether property is 'real property' as defined in this section) shall be based on the highest and best use of the property at the time it is reported as surplus property regardless of its former character or use."* (Emphasis added.) 58 Stat. 777, as amended, 59 Stat. 533, 60 Stat. 886, 61 Stat. 952.

13. The needs of the various branches of the Federal Government (Act of October 3, 1944, c. 479, § 12, 58 Stat. 770) the aiding of hospitals and educational projects, the desirability of transferring property to the states, so as to relieve tax burdens which might otherwise have to be imposed, (id. at § 13) and the desirability of providing business opportunities for veterans, (id. at § 16, 58 Stat. 773)–all of these objectives were expressed by way of statutory preferences in acquisition of surplus property.

 The Act also provided for the prevention of discrimination against small businesses, for a preference to purchases of small amounts, (id. at § 18) and for the stockpiling of strategic materials, (id. at § 22, 58 Stat. 776).

14. Housing for defense purposes was originally authorized by the Act of June 28, 1940, 54 Stat. 676, 50 U.S.C.A.Appendix,

§ 1151 et seq., followed by the Lanham Act of October 10, 1940, 54 Stat. 1125, 42 U.S.C.A. § 1521 et seq. Both of these 1940 Acts referred to housing for persons engaged in "defense" activities. In 1942 amendments were made to the 1940 Acts, and in certain of these amendments the term "war housing" is used. Act of May 26, 1942, 56 Stat. 301. Thereafter the term "war housing" was frequently used in congressional debates and elsewhere to refer to housing constructed under the 1940 and 1942 Acts. But at the same time it seems clear that the term "war housing," as used in section 23(a) of the Surplus Property Act of 1944, was not intended to be confined to housing constructed under the 1940 and 1942 Acts, or more specifically, to housing constructed under the Lanham Act of October 10, 1940. Such an interpretation would render the "war housing" category meaningless and unnecessary, for Lanham Act housing was excluded by section 34(b) of the Surplus Property Act from that Act's coverage. And the fact is that a substantial amount of housing for defense and war purposes was constructed under statutory authority other than the Lanham Act. See Appropriation Act of September 9, 1940, 54 Stat. 883, 884.

consideration is given to the statutory policy that the new rather than the former condition and potentialities should be controlling in determining whether the property should be classified as "real property," the conclusion reached by the Administrator is given additional justification. The three categories of exclusion set forth in section 23(a) (1) evinced a congressional intent that former owners should not be entitled to reacquire at private sale properties which had been the subject of large expenditure by the Government, resulting in improvements of a kind not so related to the former use of the property or so personal to the former owner as to give rise to any equitable claim by him to the improved property. The desire of Congress was to put such property back into channels of disposition based on its improved condition, rather than to recognize any claim of the former owner to regain it.

In this regard we must also note that after VE-Day and VJ-Day Congress provided on a large scale for veterans emergency housing. Not only was the use of funds for the construction of new housing projects authorized but also the use of Federal surplus property, wherever feasible, for the creation of housing for veterans, "notwithstanding any other provisions of law". 42 U.S.C.A. § 1572(b). It was pursuant to this statutory mandate that the structures on the former Lido golf course were made available to the Federal Public Housing Authority, and through that Authority to the New York State Division of Housing, for the purpose of providing emergency housing for veterans.

The Administrator's determination that the term "war housing * * * or similar structures and facilities" included veterans' emergency housing of the type here in question thus would seem well founded. In any event, it certainly does not rest upon considerations which only a capricious exercise of power could explain. And we need not decide whether, if this court were determining the question in the first instance, it would reach the same result. Where billions of dollars of assets are involved, and a vast system of priorities established, the official having authority to classify the property and determine which priorities are applicable is bound to err at times. To say that erroneous classification is beyond the Administrator's statutory authority, and thus to subject the whole disposal system to the slow process of judicial review, was certainly not within the intent of Congress. Nor is it called for by the decision of the Supreme Court in the Larson case. The court there specifically pointed out that action by an officer of the Government is no less official action when "based on an incorrect decision as to law or fact, if the officer making the decision was empowered to do so." 337 U.S. at page 695, 69 S.Ct. at page 1464. As Justice Douglas pointed out in the concurring opinion in that case, "the principles announced by the Court are the ones which should govern the selling of government property. Less strict applications of those principles would cause intolerable interference with public administration." 337 U.S. at page 705, 69 S.Ct. at page 1469. We must hold that even if appellants were correct in their contention that the Administrator's classification of the property as war housing was erroneous, this suit cannot be maintained. It is against the United States, and the United States has not consented to be sued.

The judgment of the District Court must therefore be

Affirmed.