**WEST COAST EXPLORATION CO.**

v.

**McKAY, Secretary of Interior.**
**No. 11187.**

United States Court of Appeals
District of Columbia Circuit.

Decided Jan. 26, 1954.

Writ of Certiorari
Denied June 1, 1954.

See 74 S.Ct. 850.

584

Mr. Edward D. Neuhoff, Los Angeles, Cal., of the bar of the Supreme Court of California, pro hac vice, by special leave of Court, with whom Mr. Ray L. Jenkins, Washington, D. C., was on the brief, for appellant. Mr. John W. Nairn, Washington, D. C., also entered an appearance, for appellant.

Mr. Fred W. Smith, Attorney, Department of Justice, with whom Mr. Roger P. Marquis, Attorney, Department of Justice, was on the brief, for appellee. Mr. A. Devitt Vanech, Asst. Atty. Gen., also entered an appearance, for appellee.

Mr. Northcutt Ely, Washington, D. C., filed a brief on behalf of Harvey S. Mudd, Seeley G. Mudd, Henry T. Mudd, and George D. Dub as amici curiae, urging

affirmance. Mr. Timothy V. A. Dillon; Washington, D. C., also entered an appearance for the amici curiae.

Before STEPHENS, Chief Judge, and EDGERTON, CLARK, WILBUR K. MILLER, PRETTYMAN, PROCTOR,* BAZELON, FAHY and WASHINGTON, Circuit Judges.

Chief Judge STEPHENS announced the judgment and division of the court as follows:

The court is agreed that the appellant West Coast Exploration Co. is not entitled to the relief prayed for in its complaint, and is agreed that the case should be remanded to the District Court with directions to dismiss for lack of jurisdiction.

Chief Judge STEPHENS is of the view, expressed in his opinion printed below, in which Circuit Judge CLARK, Circuit Judge MILLER, Circuit Judge PRETTYMAN and Circuit Judge BAZELON concur, that the District Court had jurisdiction to consider the case but that after hearing the case that court should have dismissed and should now, on remand, be directed to dismiss the action for lack of jurisdiction. Circuit Judge PRETTYMAN has filed an additional opinion, printed below; in which Circuit Judge BAZELON joins.

Circuit Judge WASHINGTON has stated his views in his opinion, printed below, in which Circuit Judge EDGERTON concurs.

Circuit Judge FAHY concurs in the result for reasons stated in his opinion printed below.

STEPHENS, C. J., with whom concur Circuit Judge CLARK, Circuit Judge MILLER, Circuit Judge PRETTYMAN, and Circuit Judge BAZELON: The judgment under review in this case was entered in an action commenced in the United States District Court for the District of Columbia by the filing by the appellant, West Coast Exploration Company, in this opinion referred to as West

* Circuit Judge Proctor, who heard the arguments in this case, died before the entry of judgment by this court.

Coast, of a petition seeking relief in the nature of a mandatory injunction to compel Oscar L. Chapman, the predecessor in office of the present appellee, Douglas McKay, Secretary of the Interior, to approve the selection of, and to issue a patent to, a ten acre tract of land in California. The tract was denominated "Little Placer" and will hereafter, for convenience, sometimes be so referred to. The action was commenced as the result of the following: By the Act of February 10, 1855, 10 Stat. 849 (hereafter sometimes referred to as the Gerard Act), the Congress provided as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That Reese A. P. Gerard, William Gerard, and Rachel Blue, (formerly Rachel Gerard,) the only children and heirs of Joseph Gerard, a messenger of the United States to the Indians, who was killed in seventeen hundred and ninety-two, be, and they or their heirs are hereby permitted to enter, each one of them severally, or his or their heirs, one section of the public lands, without the payment of any consideration for said three sections, being in full payment for the patriotic services of said Joseph Gerard, and in accordance with the spirit of the inducements authorized by President Washington to be held out to such persons as would consent to carry a message from Fort Washington, now Cincinnati, in seventeen hundred and ninety-two, to the hostile Indians of the then Northwest Territory."

Pursuant to that Act the Department of the Interior issued to one William Gerard, one of the heirs referred to in the Act, a "special certificate" certifying the right of William to enter one section of the public lands without the payment of any consideration. Such certificates are commonly referred to in land law parlance as "scrip" and will, in this opinion, sometimes be so referred to. Thereafter William exchanged the special certificate for sixteen special certificates, each certifying the right of William to enter one-sixteenth of a section of the public lands without the payment of any consideration. By mesne conveyances West Coast acquired the ownership of one of the sixteen special certificates and thereunder, on March 14, 1947, selected Little Placer. The tract contained minerals, to wit, deposits of sodium borates and calcium borates. The selection was regularly filed with the Bureau of Land Management of the Department of the Interior at Los Angeles and was "accepted" by that Bureau. But the selection was later rejected by the Director of the Bureau at Washington in a decision of June 2, 1947. The rejection was upon —stating them in summary form—the following grounds:

While the Gerard Act is silent with respect to the character of the land that may be located thereunder, it was the uniform policy of the Congress, at and prior to the date of the Act, to exclude mineral lands from disposal under all non-mineral land laws, Ivanhoe Mining Company v. Keystone Consolidated Mining Company, 102 U.S. 167, 26 L.Ed. 126 (1880),[1] and

1. Ivanhoe Mining Company v. Keystone Consolidated Mining Company involved the Act of March 3, 1853, 10 Stat. 244. That Act, which subjected the public lands in the State of California to the Preemption Act of September 4, 1841, 5 Stat. 453, also "granted to the State [of California] for the purposes of public schools in each township" sections 16 and 36 of the public lands. The contest was between the Keystone Company, as defendant, which claimed, under patents from the United States, mineral land located in a section 36 in California, and the Ivanhoe Company, as plaintiff, as successor to one Gillette who had received a patent to the same land from the State. The land had been identified by a survey of 1870 as a part of the 36th section of the township in which it lay, and was at that time known to be mineral land.

On appeal to the Supreme Court from a judgment entered in favor of the Keystone Company by the Circuit Court of the United States, the Supreme Court ruled that the only question presented was whether or not under the Act of March 3, 1853, and other pertinent acts of Congress, the title to the land in question became vested absolutely in the State of California on the ascertainment by the survey of 1870 that it was a part of the 36th section of the township in which it lay. It was urged by the Ivanhoe Company that the language of the granting clause in Section 6 of the 1853 Act imported "a grant in praesenti", and that wherever, by any survey of the Government thereafter made, the location of the 16th and 36th sections of a township was ascertained, it established the title in the State from the date of the statute, name-

administrative practice has accorded with that policy.[2] Therefore, location under the Gerard Act prior to the Act of July 17, 1914, 38 Stat. 509, 30 U.S.C.A. § 121 et seq., was limited to surveyed public lands, non-mineral in character.[3] Little Placer, the tract applied for, was withdrawn from settlement, location—including scrip location—sale or entry, and reserved for classification by Executive Order No. 6910

of November 26, 1934,[4] and is therefore subject to location only if classified by the Secretary of the Interior under Section 7 of the Taylor Grazing Act, as amended, 43 U.S.C.A. § 315f, as being proper for acquisition and satisfaction of outstanding scrip rights.[5] While the Act of July 17, 1914, as supplemented by the Act of March 4, 1933, 47 Stat. 1570, 30 U.S.C.A. § 124,[6] authorized the disposal under the non-min

ly March 3, 1853. To the contrary, the Keystone Company contended that the grant, in Section 6 of the Act, of school lands to the State did not cover any mineral land. The Court decided that that contention was correct and affirmed the decision of the Circuit Court. The Supreme Court ruled that Congress did not, in Section 6 of the 1853 Act, intend to depart from the uniform policy, established for public lands in California by the other provisions of the Act, of reserving mineral lands from survey, sale, pre-emption and grants, whether for railroads, public buildings, or other purposes, and that therefore the land in controversy, being mineral land, and well known to be such when the surveys were made, did not pass to the State under the school section grant in Section 6.

**2.** The decision of the Director cited the following: "*Instructions* dated October 25, 1880; Commissioner's letter of May 29, 1917, Misc. No. 707164; Commissioner's letter of October 28 and December 8, 1938, and May 1, 1939, G.L.O. 0192."

**3.** The Act of July 17, 1914, provides, so far as here pertinent: ". . . That lands withdrawn or classified as phosphate, nitrate, potash, oil, gas, or asphaltic minerals, or which are valuable for those deposits, shall be subject to appropriation, location, selection, entry, or purchase, if otherwise available, under the nonmineral land laws of the United States, whenever such location, selection, entry, or purchase shall be made with a view of obtaining or passing title with a reservation to the United States of the deposits on account of which the lands were withdrawn or classified or reported as valuable, together with the right to prospect for, mine, and remove the same . . .."

**4.** Executive Order No. 6910 of November 26, 1934, 43 Code Fed.Regs. § 297.11 (1949), provides, so far as here pertinent: "(a) Subject to the conditions expressed in the act of June 25, 1910 (36 Stat. 847), as amended by the act of August 24, 1912 (37 Stat. 497; 43 U.S.C. 141–143, 16 U.S.C. 471), it is ordered that all of the vacant, unreserved and unappropriated public land in the States of Arizona, California, Colorado, Idaho,

Montana, Nevada, New Mexico, North Dakota, Oregon, South Dakota, Utah, and Wyoming be, and it hereby is, temporarily withdrawn from settlement, location, sale, or entry and reserved for classification, and pending determination of the most useful purpose to which such land may be put in consideration of the provisions of the act of June 28, 1934 (48 Stat. 1269; 43 U.S.C. 315–315n, 1171), and for conservation and development of natural resources.

"(b) The withdrawal hereby effected is subject to existing valid rights. . . ."

**5.** Section 7 of the Taylor Grazing Act of June 28, 1934, 48 Stat. 1269, as amended by the Act of June 26, 1936, 49 Stat. 1976, provides, so far as here pertinent: "That the Secretary of the Interior is hereby authorized, in his discretion, to examine and classify any lands withdrawn or reserved by Executive order of November 26, 1934 (numbered 6910), and amendments thereto, and Executive order of February 5, 1935 (numbered 6964), or within a grazing district, which are more valuable or suitable for the production of agricultural crops than for the production of native grasses and forage plants, or more valuable or suitable for any other use than for the use provided for under this Act, or proper for acquisition in satisfaction of any outstanding lieu [*sic*], exchange or script rights or land grant, and to open such lands to entry, selection, or location for disposal in accordance with such classification under applicable public-land laws, except that homestead entries shall not be allowed for tracts exceeding three hundred and twenty acres in area. . . ."

**6.** The Act of March 4, 1933 provides: ". . . That lands withdrawn, classified, or reported as valuable for sodium and/or sulphur and subject to prospecting, leasing, or development under the General [Mineral] Leasing Act of February 25, 1920, or Acts amendatory thereof or supplementary thereto, shall be subject to appropriation, location, selection, entry, or purchase if otherwise available in the form and manner and subject to the reservations, provisions, limitations, and conditions of the Act of Congress approved July 17, 1914 (38

eral public land laws of lands withdrawn or classified as valuable for phosphate, nitrate, potash, oil, gas, asphaltic or sodium minerals, the supplementing Act of March 4, 1933 provides that lands withdrawn, classified or reported as valuable for any of the minerals named shall not be subject to such disposal unless the Secretary of the Interior shall determine that it will not unreasonably interfere with operations under the federal mineral leasing laws. The Geological Survey had reported that information available to it indicated that unreasonable interference with operations under the sodium provisions of the Mineral Leasing Act [7] would result from the disposal of the surface of the land under the non-mineral application. Therefore, the 1914 and 1933 Acts would not avail to remove the bar imposed by the construction and administration of the Gerard Act against the location of Gerard scrip on mineral land. Since the scrip application would have to be rejected on that ground, for that reason alone the tract sought, Little Placer, may not be classified as proper for scrip location.

After this rejection by the Director of the Bureau of Land Management, West Coast filed a motion for rehearing. On November 18, 1947, the Secretary of the Interior denied the motion—thereby affirming the Director's rejection of the selection of Little Placer—in a decision the pertinent parts of which are the following:

"West Coast contends that its Gerard scrip may be located on mineral lands and consequently that the act of March 4, 1933, is inapplicable to this situation.

"Under the act of February 10, 1855, *supra*, Gerard scrip may be located on 'the public lands.' But as used in that act, the term 'public lands' does not include mineral lands in California. . . . The Supreme Court has held that an act granting sections 16 and 36 of the public lands to the State of California without specific exclusion therefrom of mineral lands, passed only 2 years prior to the Gerard scrip act, was nevertheless intended to exclude from its operation mineral lands. Ivanhoe Mining Company v. Keystone Consolidated Mining Company, 102 U.S. 167, 26 L.Ed. 126 (1880). The Court discussed extensively the act there under consideration as well as other statutes enacted during the same period, reviewed the history of the settlement of California, the discovery of mineral wealth in that area, and the statutes and practices relating to the survey of these lands. It was concluded that

"' * * *, Congress, after keeping this matter in abeyance about sixteen years, enacted, in 1866, 14 Stat. at L., 251, a complete system for the sale and other regulation of its mineral lands, so totally different from that which governs other public lands as to show

Stat.L. 509; U.S.C., title 30, sec. 123): *Provided, however*, That lands lying within the geologic structure of a field, or withdrawn, classified, or reported as valuable for any of the minerals named herein and/or in any of said Acts, or upon which leases or prospecting permits have been applied for or granted, for the production of any of such minerals, shall not be subject to such appropriation, location, selection, entry, or purchase unless it shall be determined by the Secretary of the Interior that such disposal will not unreasonably interfere with operations under said leasing Acts."

7. The reference is to the Mineral Leasing Act of February 25, 1920, 41 Stat. 437, 30 U.S.C.A. §§ 22, 48, 171, 181 et seq., 201 et seq., That Act provides—stating, in substance and effect, the provisions here pertinent—that: Deposits of coal, phosphate, sodium, oil, oil shale, or gas, and lands containing such deposits owned by the United States, shall be subject to disposition, in the form and manner below explained, to citizens of the United States or associations of such persons or to any corporation organized under the laws of the United States, or of any State or Territory, and in the case of coal, oil, oil shale, or gas, to municipalities. In respect of sodium, the Secretary of the Interior is authorized to grant to any qualified applicant a prospecting permit for chlorides, sulphates, carbonates, borates, silicates, or nitrates of sodium dissolved in and soluble in water, and accumulated by concentration, for a period not exceeding two years and for an area not to exceed 2,560 acres of land in reasonably compact form. Upon a showing to the satisfaction of the Secretary that valuable deposits of one of the sodium substances enumerated has been discovered by the permittee within the area covered by his permit, and that such land is chiefly valuable therefor, the permittee shall be entitled to a lease for one-half of the land embraced in the prospecting permit at a royalty of not less than one-eighth of the amount or value of the production, and also the preference right to lease the remainder of the land embraced within the limits of the permit at a royalty of not less than one-eighth of the amount or value of the production to be fixed by the Secretary of the Interior. Such leases may be for indeterminate periods subject to readjustment at the end of each twenty-year period upon conditions not inconsistent with the Act to be incorporated in each lease or prescribed in general regulations issued by the Secretary of the Interior.

that it could never have been intended to submit them to the ordinary laws for disposing of the territory of the United States.' (102 U. S. 167, 174, 26 L.Ed. 126).

"The Court's reasoning and conclusions with respect to the statute there under consideration is equally applicable with respect to the question of whether Gerard scrip may be located upon mineral lands in California. And the administrative practice has conformed to this conclusion, as illustrated by the various precedents cited in the decision approved on June 2, 1947.

"In its motion, West Coast does not controvert the finding that the land it seeks is mineral. It does contend, however, that the act of March 4, 1933, is inapplicable because Gerard scrip may be located upon mineral land. It continues by assuming, *arguendo*, that even if the act does apply, the location of this scrip upon this particular tract would not interfere with operations under the Federal leasing laws. The act of March 4, 1933, permits selection of mineral lands with a reservation to the United States of the minerals which are subject, as are those on this tract, to the Mineral Leasing Act, provided that no land shall be subject to such selection 'unless it shall be determined by the Secretary of the Interior that such disposal will not unreasonably interfere with operations' under the Mineral Leasing Act.

"In Caswell S. Neal (A–24147, April 9, 1946), scrip was filed on land already under mineral lease to a corporation which sought surface ownership, it appeared, to enable it to protect its mining operations and the necessary structures it had erected in connection with the mining activities. The Department there said

" 'While it may be advantageous to the corporation to secure a fee title to these lands, this advantage cannot hold sway over the interest of the public in assuring that future mining operations on this tract will not be impeded by adverse holders of the surface title. It is true that the buildings and structures of the corporation used in its mining operations at present occupy a substantial part of the lands sought * * *, but it must be remembered that the corporation pursues its business upon these lands only by reason of a lease. The granting of the application * * * would enable the passing to the corporation of a permanent interest in the lands which, so long as the corporation might hold the lease, would not be adverse to such rights as it may possess to the minerals on the land or interfere with its operations thereon. Should a situation arise, however, whereby the lease of the minerals on these lands were granted to others than this particular corporation or its successor in interest, the adverse situation referred to by the Geological Survey would be readily apparent. In the interest of protecting future mining operations on this land from interference by possible adverse holders of the surface title, the application * * * should be denied.'

"The same reasons are applicable to the present situation, especially since West Coast at the present time has no rights whatever in the minerals here involved and the probability of its being the successful bidder at a future offering of a lease of the land is purely speculative. Utah Magnesium Corporation, A–24349, September 11, 1946.

"West Coast also contends that the land is not subject to classification under section 7 of the Taylor Grazing Act (48 Stat. 1272, 49 Stat. 1976, 43 U.S.C. [§ 315f]) because this 10 acres was under a mineral lease at the time of the issuance of the general withdrawal order No. 6910 of November 26, 1934, and the withdrawal order by its own terms was 'subject to existing valid rights.'

"Among other matters, section 7 provides that the lands withdrawn by Executive Order 6910 of November 26, 1934, may be classified by the Secretary as suitable for disposition under outstanding scrip rights and be opened, pursuant to such classification, to acquisition under the appropriate land laws. Because the withdrawal order was 'subject to existing valid rights' and because at the time of the issuance of the withdrawal order this 10 acres was under a mineral lease which has since been terminated, West Coast contends that the land was never withdrawn by order 6910 and consequently is not subject to classification under section 7. In the first place, the mineral lease then outstanding was not held by West Coast so that the rights, if any, to be protected were not those of West Coast. In the second place, the Department has consistently held that the order does 'cover all lands which might become vacant, unreserved, and unappropriated during the life of the order.' Op.Sol., 55 I.D. 205, 207, 208 (1935). Consequently, upon the termination of the outstanding mineral lease, the order attached fully to this 10 acres and brought them into the orbit of section 7.

"Since the land is rich in minerals subject to leasing under the Mineral Leasing Act, *supra*, and since the Mineral Leasing Act provides an orderly scheme for the extraction of minerals under procedures which safeguard the public interest in the fruitful exploitation of this natural wealth, it is not appropriate to classify this tract for disposal under any land law which would enable one not the mineral lessee to interfere with or impede the extraction of the minerals.

"West Coast also states that it was entitled to a hearing before the Bureau of Land Management. But no statute or regulation requires that it have an oral hearing in connection with its application. Moreover, there is no substantial material issue of fact, for the assumption of the decision is that the surface owner would have the power to interfere with and impede the extraction of minerals and any lease issued hereafter. And this fact cannot reasonably be controverted. Moreover, on this motion, West Coast has fully exercised its privilege to present in writing all facts and arguments favorable to its position."

On March 18, 1948, West Coast filed its petition in the District Court. The petition referred to and summarized the Gerard Act. It alleged the selection of Little Placer, the filing of the selection with the Bureau of Land Management at Los Angeles, the acceptance of the selection by that Bureau and the rejection of the selection by the Director of the Bu-

reau at Washington and the affirmance by the Secretary of the Interior of the Director's rejection. The petition then asserted that the decision of the Secretary was contrary to, and in violation of, the Gerard Act, was a substitution of the judgment of the Secretary for the will of Congress, and a refusal to discharge a mandatory and purely ministerial duty imposed upon the Secretary by law, West Coast having—according to the assertions of the petition—a clear right to approval by the Secretary of the selection of Little Placer and a clear right to the issuance of a patent thereto, and having exhausted all of its administrative remedies. The petition asserted, in effect, that the Secretary, in rejecting the application of West Coast for a patent to Little Placer, was acting beyond or in want of statutory power. The petition prayed relief by an order of the court commanding the Secretary to approve the selection of the land in question and to issue a patent thereto. An answer was filed by the Secretary raising issue as to the right of West Coast to Little Placer. The answer in the large, so far as here pertinent, made the assertions of fact and took the legal positions set forth in

the decisions of the Director of the Bureau of Land Management and of the Secretary of the Interior.

In the District Court the case was submitted for decision upon the pleadings and upon a stipulated statement of facts. That statement left no dispute as to the terms of the Gerard Act, as to the location of Little Placer, as to its being mineral land containing sodium borate, or as to the Secretary's having found it to be such mineral land. It was not alleged in the petition of West Coast nor stated in the stipulated statement of facts that the tract of land covered by the West Coast selection had been offered at public auction and remained available for purchase at private sale, and it is not contended by West Coast on this appeal that such was the fact. The District Court dismissed the petition upon, *inter alia,* the theories raised by the answer. It rested its decision in part, as did the Secretary, upon Ivanhoe Mining Company v. Keystone Consolidated Mining Company, the ruling in which is stated in footnote 1, *supra.* But the court rested its decision also upon Chotard v. Pope, 12 Wheat. 586, 6 L.Ed. 737 (U.S. 1827); [8] Stockley

8. Chotard v. Pope involved the Act of May 8, 1820, passed "for the relief of the legal representatives of Henry Willis." The Act provided: "That the legal representatives of Henry Willis be, and they are hereby, authorized to enter, without payment, in lieu of two tracts of land, claimed by them, on the waters of Bayou Sarah, and which have been sold by the United States, in any land office in the states of Mississippi or Alabama, and in such quantities, agreeably to the surveys made by the United States, as the claimants may desire, a quantity not exceeding thirteen hundred arpens; for which the register or registers of the land offices aforesaid, shall issue the necessary certificate or certificates, on return of which, to the General Land Office, a patent or patents shall issue in favor of said legal representatives." 6 Stat. (Private Acts) 246.

The complainants in the case, who claimed under the Willis Act, assuming the right under the words thereof to appropriate any unpatented land in the two states named, asserted the privilege of

entering a tract of land which had by a previous law been "appropriated" for the site of a town and surveyed and "layed off" for a town (Claiborne) in Alabama. The proper officers refused to issue the ordinary evidences of title and went on to sell out the town lots according to law. A bill was filed by the complainants against the register of the land office and the purchaser of one of the town lots to compel them to make titles. On behalf of the United States it was contended that the literal meaning of the terms of the Willis Act was limited and restrained by the context, and by considerations arising out of the general system of land laws of the United States into which the Act was ingrafted, and that so construed the right granted was limited to that description of lands which are liable to be taken up at private sale. There was a decree against the complainants. On appeal to the Supreme Court that tribunal upheld the contention of the United States and ruled that the land available under the Willis Act did not include land theretofore appropriated by law for the site of a town. The Court held that the

v. United States, 260 U.S. 532, 43 S.Ct. 186, 67 L.Ed. 390 (1923) ; [9] and Deffeback v. Hawke, 115 U.S. 392, 404, 6 S.Ct. 95, 29 L.Ed. 423 (1885).[10] Upon entry of the judgment dismissing the petition, appeal to this court was taken by West Coast.

The appeal presents two questions, one as to the jurisdiction of the District Court, the other as to whether or not West Coast is entitled to the relief sought in its complaint, if the District Court had jurisdiction.

# I

No question as to the jurisdiction of the District Court to entertain the action was raised in that court. But on the appeal, at a hearing first held by a division of this Court of Appeals, this court sua sponte raised a question as to the jurisdiction of the District Court to entertain the action and required briefs to be presented upon that question; and upon such briefs, and upon the briefs theretofore presented upon the merits, and after oral argument, the case was submitted for decision upon the jurisdictional question and, if it should be decided that the District Court had jurisdiction, upon the question whether or not West Coast was entitled to the relief sought in its petition. Thereafter, because of the importance of the jurisdictional question, an in banc rehearing was ordered by a majority of the active judges of this court.[11] At such rehearing the case was reargued and again submitted for decision upon briefs and supplemental briefs discuss-

Willis Act applied, because of the technical meaning which had become attached under the land laws to the term "entry", only to such public land as, after first having been offered at public auction, remained available for purchase at private sale. Specifically the Court said: "The term entry * * * means that act by which an individual acquires an inceptive right to a portion of the unappropriated soil of the country, by filing his claim in the office of an officer known in the legislation of several states by the epithet of an entry-taker, and corresponding very much in his functions with the registers of land offices, under the acts of the United States. In the natural progress of language, the term has been introduced into the laws of the United States; and, by reference to those laws, we think the meaning of the term will be found to be distinctly confined to the appropriation of lands under the laws of the United States, at private sale.

"It is familiarly known, that the public lands are uniformly brought into market in pursuance of a system which commenced in the year 1796, and was perfected about the year 1800. The lands are first surveyed, then advertised at public auction, and then whatever remains unsold at public auction is offered at private sale to the first applicant, at stipulated prices." (12 Wheat. at 588, 6 L.Ed. 737.)

9. Stockley v. United States was apparently relied upon by the District Court because the opinion of the Court in that case refers with apparent approval to the definition of the term "entry" given in Chotard v. Pope.

10. Deffeback v. Hawke was relied upon by the District Court apparently for the statement at page 404 of 115 U.S., at page 100 of 6 S.Ct.: "It is plain, from this brief statement of the legislation of Congress, that no title from the United States to land known at the time of sale to be valuable for its minerals of gold, silver, cinnabar, or copper can be obtained under the pre-emption or homestead laws or the town-site laws, or in any other way than as prescribed by the laws specially authorizing the sale of such lands, except in the States of Michigan, Wisconsin, Minnesota, Missouri and Kansas." The actual holding of the case is that no title from the United States to land known at the time of sale to be valuable for its minerals can be obtained under the townsite laws.

11. The jurisdictional question is important because of a contention, discussed infra, that any suit brought against an officer of the Government questioning the validity of his action in respect of the disposition of public property is a suit against the United States over which the courts have no jurisdiction in the absence of consent by the Government. If this contention is valid it is of far-reaching effect. The United States District Court for the District of Columbia has long dealt with suits against officers of the Government, including the Secretary of the Interior, to restrain by injunction threatened action assertedly in violation of a clear legal right or to compel by mandamus action to which assertedly there is a clear legal right; and some of those suits have involved the disposition of public property. See for example Red

ing both the jurisdictional question and the issues of law presented by the petition, the answer, and the stipulated statement of facts.

▮▮▮ The jurisdictional question has two aspects: one, whether or not the District Court had jurisdiction of the proceeding or, as it is sometimes stated, of the subject matter of the action; the other, whether or not it had jurisdiction of the necessary parties. A court is said to have jurisdiction, in the sense that its erroneous action is voidable only, not void, when the parties are properly before it, the proceeding is of a kind or class which the court is authorized to adjudicate, and the claim set forth in the paper writing invoking the court's action is not obviously frivolous. United States v. Williams, 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747 (1951); Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Binderup v. Pathe Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308 (1923); Cooper v. Reynolds, 10 Wall. 308, 19 L.Ed. 931 (U.S.1870); De-Benque v. United States, 66 App.D.C. 36, 85 F.2d 202, 106 A.L.R. 839 (D.C.Cir., 1936); Brougham v. Oceanic Steam Navigation Company, 205 F. 857 (2d Cir.1913); Hughes v. Cuming, 165 N.Y. 91, 58 N.E. 794 (1900). Cf. United States v. United Mine Workers, 330 U.S. 258 (1947) and cases therein cited at page 293 in footnote 58, 67 S.Ct. 677, 91 L.Ed. 884. In view of the confusion which seems to have arisen in the case with reference to the first aspect of the jurisdictional question, there are set forth below statements, in leading cases on the subject, which we think adequately describe the criteria for determination of the question whether a court has jurisdiction of a given proceeding:

"Jurisdiction is the power to decide a justiciable controversy, and includes questions of law as well as of fact. A complaint setting forth a substantial claim under a federal statute presents a case within the jurisdiction of the court as a federal court; and this jurisdiction cannot be made to stand or fall upon the way the court may chance to decide an issue as to the legal sufficiency of the facts alleged any more than upon the way it may decide as to the legal sufficiency of the facts proven. * * * Jurisdiction, as distinguished from merits, is wanting only where the claim set forth in the complaint is so unsubstantial as to be frivolous or, in other words, is plainly without color of merit." (Binderup v. Pathe Exchange, supra, 263 U.S. at 305–306, 44 S.Ct. at 98.)

"By jurisdiction over the subject-matter is meant the nature of the cause of action and of the relief sought; and this is conferred by the sovereign authority which organizes the court, and is to be sought for in the general nature of its powers, or in authority specially conferred." (Cooper v. Reynolds, supra, 10 Wall. at 316, 19 L.Ed. 931.)

"* * * [J]urisdiction of the subject-matter . . . 'is power to adjudge concerning the general question involved, and is not dependent upon the state of facts which may appear in a particular case, arising or which is claimed to have arisen, under that general question. * * * It is the power to act upon the general, and, so to speak, the abstract question, and to determine and adjudge whether the particular facts presented call for the exercise of the abstract power.'" (Hughes v. Cuming, supra, 165 N.Y. at 95, 58 N.E. at 795.)

"The jurisdiction with which we are concerned is the power to hear and determine a cause. It is not limited to making correct decisions but includes power to decide wrong as well as right. As applied to a particular controversy it is the power to hear and determine the subject-matter of that controversy. *And by this is meant the power to hear and determine causes of the class to which the particular controversy belongs.* It is the power to act upon the general question in its relation to the facts presented; to adjudge whether facts call for the exercise of the abstract power." (Emphasis supplied.) (Brougham v. Oceanic Steam Navigation Company, supra, 205 F. at 859.)

"Jurisdiction, therefore, is not defeated as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction. Swafford v. Templeton, 185 U.S. 487, 493, 494, 22 S.Ct. 783, 46 L.Ed. 1005; Binderup v. Pathe Exchange, 263 U.S. 291, 305–308, 44 S.Ct. 96, 68 L.Ed. 308. . . .. The previously carved out exceptions are that a suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the

Canyon Sheep Company v. Ickes, 69 App. D.C. 27, 98 F.2d 308 (D.C.Cir.1938); United States ex rel. United States Bo-

rax Co. v. Ickes, 68 App.D.C. 399, 98 F. 2d 271 (D.C.Cir.1938).

Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous. The accuracy of calling these dismissals jurisdictional has been questioned. The Fair v. Kohler Die & Specialty Co., supra, 228 U.S. 22, at 25, 33 S.Ct. 410, 57 L.Ed. 716. But cf. Swafford v. Templeton, supra." (Bell v. Hood, supra, 327 U.S. at 682–683, 66 S.Ct. at 776.)

Those decisions and the reasoning therein dispose of the question whether or not the District Court in the instant case had jurisdiction over the proceeding or the subject matter of the action. As appears above, the petition sought relief in the nature of a mandatory injunction. And as stated above the United States District Court for the District of Columbia has long exercised jurisdiction in cases in which mandatory relief compelling the performance by a federal officer of a clear legal duty is sought. Wilbur v. United States ex rel. Krushnic, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930); Roberts v. United States, 176 U.S. 221, 20 S.Ct. 376, 44 L.Ed. 443 (1900); United States ex rel. United States Borax Co. v. Ickes, supra, footnote 11, and cases arising in this jurisdiction referred to therein.[12]

The second aspect of the jurisdictional question, whether or not the District Court had the necessary parties before it—in the absence of such parties a court of course cannot validly enter a judgment—arises by virtue of a contention that since the suit is filed against the Secretary of the Interior and involves the disposition of public lands the District Court could not consider the case, but should have dismissed it forthwith as a suit against the United States which had not consented to be sued. In our opinion that contention is not supportable in view of the method recognized by the Supreme Court in the following cases for determination of similar preliminary jurisdictional questions.

Payne v. Central Pac. Ry. Co., 255 U.S. 228, 41 S.Ct. 314, 65 L.Ed. 598 (1921); Northern Pac. Ry. Co. v. State of North Dakota ex rel. Langer, 250 U.S. 135, 39 S.Ct. 502, 63 L.Ed. 897 (1919); Wells v. Roper, 246 U.S. 335, 38 S.Ct. 317, 62 L.Ed. 755 (1918); Lane v. Watts, 234 U.S. 525, 34 S.Ct. 965, 58 L.Ed. 1440 (1914); United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882); Transcontinental & Western Air v. Farley, 71 F.2d 288 (2d Cir.), certiorari denied, 293 U.S. 603, 55 S.Ct. 119, 79 L.Ed. 695 (1934). The rulings in those cases, each commenced upon the theory that Government officers were acting without power, and holding in the Northern Pacific, the Lee, the Payne, and the Lane cases, the United States not a necessary party, and in the Farley and Roper cases, a necessary party, are explainable as follows: Where a plaintiff asserts in his complaint that an officer of the Government is acting without power and that therefore his acts are invalid, the court, in determining the preliminary jurisdictional question whether or not the United States is a necessary party, is confronted with a problem arising out of the fact that the determination of that question involves passing upon the very question involved in the merits. For example, in the Northern Pacific case, brought to restrain the Director General of Railroads, who had imposed a schedule of intrastate rates, from enforcing the same, upon the ground that he had no power except respecting interstate rates, the question arose at the threshold whether or not the United States was a necessary party. Necessary parties are those "affected by the judgment and against which in fact it will operate . . . ." Minnesota v. Hitchcock, 185 U.S. 373, 387, 22 S.Ct. 650, 655, 46 L.Ed. 954 (1902). If the Director

12. By rule 81(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., the writ of mandamus is abolished. But the same rule provides that relief theretofore available by mandamus may be obtained by appropriate action or by appropriate motion under the practice prescribed in the rules. In Hammond v. Hull, 76 U.S. App.D.C. 301, 131 F.2d 23 (D.C.Cir.1942), it was ruled that the remedy which, before adoption of the new Rules of Civil Procedure, was known as mandamus, is available under the new rules and is governed by the same principles as formerly governed its administration.

General had no power over intrastate rates, then the United States was not a necessary party because it had nothing to do with the imposition and enforcement thereof, and a judgment restraining the effectiveness of the schedule would operate only against the Director General individually. If, on the contrary, the Director General had power over intrastate rates, then the United States was responsible for his imposing and enforcing the schedule and the judgment would operate against it. Thus the ultimate question was also the jurisdictional question. A similar problem was presented in each of the cases just cited. Since a court must determine at the outset its jurisdiction to consider a case presented, it is compelled to make a preliminary decision, for jurisdictional purposes, on the ultimate question in the suit, and this notwithstanding the fact that if jurisdiction to consider the case is recognized, and the merits of the claim for relief therefore heard, the court may, on the merits, be compelled to reach an opposite conclusion.

The courts solve this problem by accepting at their face value, for jurisdictional purpose, the assertions of the complainant of want of power in the officer —unless such assertions are "so unsubstantial and frivolous as to afford no basis for jurisdiction . . . "[13]— and by giving the assertions thus accepted their natural jurisdictional consequences in respect of who are necessary parties.[13a] Thus in the Northern Pacific case the Court, to determine whether the United States was a necessary party, accepted as true the assertion of want of power in the Director General, and therefore held that the United States was not a necessary party, and this al-

though when the merits were passed on, the Court reached the conclusion that the Director General did have power to impose and enforce the local rates. Again in the Lee case the Court accepted, for jurisdictional purpose, the assertions of the plaintiff that the officers holding the Lee property for the Government were without power so to do, and therefore held the Government not a necessary party. In that instance the jurisdictional holding coincided with the ultimate holding. A similar result for the same reason was reached in the Payne and Lane cases. In the Farley case the same jurisdictional method resulted in holding the Government a necessary party. The assertion was that Farley was without power to cancel air mail contracts which had been entered into between the United States and the complainant. Accepting that assertion at face value for jurisdictional purpose, the consequence was that if Farley was without power to cancel the contracts the Government was bound to perform them; therefore it was a necessary party; and it was so held. Again in the Roper case the same result was reached on similar facts and for the same reason.

It is to be noted that the foregoing method of solving the preliminary jurisdictional question in such cases as the instant case and those just discussed was approved by the Supreme Court in Land v. Dollar, 330 U.S. 731, 738–739, 67 S. Ct. 1009, 1012, 91 L.Ed. 1209 (1946) where the Court said:

" * * * But public officials may become tort-feasors by exceeding the limits of their authority. And where they unlawfully seize or hold a citizen's realty or chattels, recoverable by appropriate action at law or in equity, he is not relegated to the Court of Claims to recover a money judgment. The dominant interest of the sovereign is then on the side of the victim

---

13. Northern Pac. Ry. Co. v. State of North Dakota, ex rel. Langer, supra, 250 U.S. at page 152, 39 S.Ct. at page 506.

13a. It is to be noted that this method of solving the jurisdictional problem is not substantially different from that followed in determining whether or not a cause of action is stated in a complaint. On demurrer, or motion to dismiss, the court accepts as true, unless they are palpably unsubstantial and frivolous, the allegations of the complaint; if, so accepting them, the court finds that the facts stated constitute a cause of action the court will hear the case—and this notwithstanding the fact that upon the hearing it may appear that the allegations are not sustainable and that the case must therefore be dismissed upon the merits.

who may bring his possessory action to reclaim that which is wrongfully withheld.

"It is in the latter category that the pleadings have cast this case. That is to say, *if the allegations of the petition are true,* the shares of stock never were property of the United States and are being wrongfully withheld by petitioners who acted in excess of their authority as public officers. If ownership of the shares is in the United States, suit to recover them would of course be a suit against the United States. But if it is decided on the merits either that the contract was illegal or that respondents are pledgors, they are entitled to possession of the shares as against petitioners, though, as we have said, the judgment would not be *res judicata* as against the United States. See United States v. Lee, supra, 106 U. S. 196, p. 222, 1 S.Ct. 240." (Emphasis supplied.)

See also Mine Safety Appliances Co. v. Forrestal, 326 U.S. 371, 66 S.Ct. 219, 90 L.Ed. 140 (1945), wherein the Court recognized, in the words quoted below, the foregoing method of solving such a jurisdictional question as is presented in the instant case, although the Court's ultimate decision was that the United States was a necessary party:

"* * * Appellant contends that the action seeks to prevent a tort by the Secretary, acting as an individual and not as an officer of the government, consisting of a trespass against appellant's property, and that equitable relief is necessary because appellant has no adequate remedy at law and since it would otherwise suffer irreparable loss. Under our former decisions, had the factual allegations supported these contentions, the complaint as filed would, in the absence of any further proceedings, have provided a basis for the equitable relief sought. See e. g., Philadelphia Company v. Stimson, 223 U.S. 605, 619–620, 32 S.Ct. 340, 56 L.Ed. 570. For according to these cases, if we assume, as we must for the purpose of disposing of the jurisdictional issue, that appellant's allegations including the one that the Renegotiation Act is unconstitutional are true, the fact that the Secretary had acted pursuant to the command of that statute would have made no difference. These cases hold that a public officer can not justify a trespass against a person's property by invoking the command of an unconstitutional statute. Under such circumstances, *the tort becomes the officer's individual responsibility,* and the government is not held to have sufficient interest in the controversy to be considered an indispensable party." (326 U.S. at 373–374, 66 S.Ct. at 221.) (Emphasis supplied.)

If in the instant case the foregoing method of solving the preliminary jurisdictional question as to the need *vel non* of the presence before the District Court of the United States as a party defendant can be applied, the result will be as follows: As pointed out at the outset of this opinion, the petition of West Coast in effect asserted that in rejecting the West Coast selection of Little Placer, and application for a patent thereto, the Secretary was acting beyond or in want of statutory power. It can not be said that that assertion is "so unsubstantial and frivolous as to afford no basis for jurisdiction . . . ." Accepting the assertion for the preliminary jurisdictional purpose only, as true, the action is not one against the United States but one to compel the Secretary of the Interior, himself, to perform a clear legal duty. Therefore, the Secretary, not the United States, is the necessary party defendant; his presence before the District Court was not in dispute; and West Coast was of course before the court by virtue of its own petition. Therefore the District Court had before it the necessary parties and in that aspect of the jurisdictional question was empowered to proceed and consider the case.

It is however contended that the decision of the Supreme Court in Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), stands in the way of reaching such a conclusion and of the method of reaching it above outlined. We think that that contention is not valid. The charge in the complaint filed in the United States District Court for the District of Columbia in the Larson case was, in effect, that the War Assets Administration was refusing to perform a contract for the sale of surplus coal, which contract had been consummated with resultant title in the plaintiff, Domestic and Foreign Corporation. But it also appeared from the allegations of the complaint that there was a dispute between War Assets and the plaintiff as to whether or not the conditions required by War Assets for purchase of the coal had been fulfilled. In brief, the action or inaction questioned in the Larson case was that of War Assets in the exercise of its authority in disposing of surplus property of the Government and in negotiating

and performing contracts for such disposal. It was not charged in the complaint that War Assets had acted beyond that authority or unconstitutionally. The relief prayed for was a declaration by the District Court that the contract of sale by War Assets to the plaintiff was valid and that a purported sale to a third party was invalid; and an injunction was sought preventing disposition of the coal to the third party. The District Court held that the relief sought in the complaint was against the United States and therefore dismissed the suit for lack of a necessary party, the Government not having consented to be sued. This Court of Appeals reversed. The Supreme Court on certiorari affirmed the decision of the District Court. It did so, as we read the case, because the allegations of the complaint, looked at for the purpose of determining whether or not the District Court had the necessary parties before it, charged erroneous action on the part of War Assets *within* its authority and not conduct beyond the power of War Assets or of unconstitutional character. In respect of such conduct (*i. e.,* conduct beyond the power of a Government official or of unconstitutional character) alleged in a complaint against a Government official, the Supreme Court in the Larson case definitely recognized exceptions. On this subject it said:

"There may be, of course, suits for specific relief against officers of the sovereign which are not suits against the sovereign. If the officer purports to act as an individual and not not as an official, a suit directed against that action is not a suit against the sovereign. If the War Assets Administrator had completed a sale of his personal home, he presumably could be enjoined from later conveying it to a third person. On a similar theory, where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are *ultra vires* his authority and therefore may be made the object of specific relief. It is important to note that in such cases the relief can be granted, without impleading the sovereign, only because of the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient. And, since the jurisdiction of the court to hear the case may depend,

as we have recently recognized, [Here the Court, in footnote, cited Land v. Dollar from which we quote supra.] upon the decision which it ultimately reaches on the merits, it is necessary that the plaintiff set out in his complaint the statutory limitation on which he relies.

"A second type of case is that in which the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional. Actions for *habeas corpus* against a warden and injunctions against the threatened enforcement of unconstitutional statutes are familiar examples of this type. Here, too, the conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign. The only difference is that in this case the power has been conferred in form but the grant is lacking in substance because of its constitutional invalidity.

"These two types have frequently been recognized by this Court as the only ones in which a restraint may be obtained against the conduct of Government officials." (337 U.S. at 689–690, 69 S.Ct. at 1461.)

The Court said also:

"* * * Since we must therefore resolve the conflict in doctrine . . . we adhere to the rule applied in the Goldberg case [Goldberg v. Daniels, 231 U.S. 218, 34 S.Ct. 84, 58 L.Ed. 191 (1913)] and to the principle which has been frequently repeated by this Court, both before and after the Goltra case [Goltra v. Weeks, 271 U.S. 536, 46 S.Ct. 613, 70 L.Ed. 1074 (1926)]: the action of an officer of the sovereign (be it holding, taking or otherwise legally affecting the plaintiff's property) can be regarded as so 'illegal' as to permit a suit for specific relief against the officer as an individual only if it is not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void. . . . ." (337 U.S. at 701–702, 69 S.Ct. at 1467.)

It is to be noted that the allegations of the petition filed in the instant case place the case, for the jurisdictional purpose, so far as the questioned need of the United States as a party is concerned, clearly within the first of the two exceptions noted by the Supreme Court. That Court in the Larson case did not refer to, but can not, we think, be said to have overruled its decisions in Payne v. Central Pac. Ry. Co.; Northern Pac. Ry. Co. v. State of North Dakota ex rel. Langer; Wells v. Roper; Lane v. Watts; United States v. Lee; Transcontinental & Western Air v. Farley; and Mine Safety Appliances Co. v. Forrestal, supra.

It is true that there is a statement by this Court of Appeals in Seiden v. Larson, 88 U.S.App.D.C. 258, 188 F.2d 661

(D.C.Cir.1951) at page 665, under topic III, which purports to construe the Larson case as decided by the Supreme Court as holding that the jurisdictional exceptions above described are not applicable in cases in which Government property is involved. The statement is to the effect that "The Court did not hold that where Government property was concerned a showing of lack of statutory authority would suffice." That statement in Seiden v. Larson is based upon footnote 11 appearing at page 691 of 337 U.S., at page 1462 of 69 S.Ct.[14] But we think that the holding of the Larson case is as above described in this opinion and that its ruling recognizing the two jurisdictional exceptions is not modified or lessened in force by the footnote referred to, and that it does not preclude the application of the exceptions to cases in which Government property is involved. Accordingly, to the extent that the decision in Seiden v. Larson construes the decision of the Supreme Court in the Larson case in a manner in conflict with our understanding of that decision, it is, in our view, erroneous, and is overruled. It is to be noted further that Seiden v. Larson does not discuss either aspect of the preliminary jurisdictional question which is the subject of the present discussion in the instant case—it deals only with the merits—and it does not take into account the authorities relating to that question which are relied upon supra. It is to be still further noted that the allegations of the complaint filed in the District Court in Seiden v. Larson do not charge action by a Government officer beyond statutory authority or without constitutional basis.

■■■ Since it is elementary that action or inaction of a public officer beyond or in want of statutory (or constitu-

tional) authority may be corrected by suit against the officer individually and that the Government is not, under such circumstances, a necessary party, the contention that the Larson case rules that even though a public officer is charged with action, or inaction, beyond or without lawful authority this may not be corrected by a suit against the officer alone, if the case involves the disposition of public lands, is an extreme contention indeed. Under such a ruling a person who had, under the homestead laws, fully satisfied the requirements for residence and cultivation and who had paid the required fees could be denied a patent to the land by the Secretary of the Interior acting wholly arbitrarily and the homesteader would be without recourse in the courts. The courts would be obliged under such a construction of the Larson case as is contended for to refuse to consider the case. Under such a ruling the locator of a mining claim who had made the required discovery of ore, performed the required assessment work and paid the necessary fees, could be arbitrarily denied a patent and there would be no recourse in the courts. Such a denial of recourse to the courts would be abhorrent to the justice according to law contemplated by the Constitution. The due process clause of the Fifth Amendment endows the United States courts with power, even though there is no statutory provision for direct review of the action of a public officer, to protect against arbitrary action by such an officer. No such meaning of the Larson case as is contended for can, in our view, be attributed to the Supreme Court.

We think, therefore, that the decision in the Larson case does not stand in the way of reaching such a conclusion on the second aspect of the jurisdictional question as is above stated.

14. Footnote 11 in the Larson case reads as follows: "Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested can not be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property. North Carolina v. Temple, 134 U.S. 22, 10 S.Ct. 509, 33 L.Ed. 849 (1890)."

## II

It must next be determined whether or not the District Court, considering the case upon the pleadings and the stipulated statement of facts, correctly decided—as it did in adjudging that West Coast is entitled to no relief against the Secretary and that its petition should be dismissed—that the Secretary, in rejecting the application of West Coast for a patent to Little Placer, was acting pursuant to law and not, as is asserted in the petition of West Coast, beyond or in want of statutory power.

 In the instant case there were no material questions of fact before the District Court. As appears above, it was without dispute that the land embraced in the tract called Little Placer was mineral land in California, and it was not contended that the land had been offered at public auction and remained available for purchase at private sale. It was without dispute that by mesne conveyances West Coast had acquired the ownership of one of the sixteen special certificates certifying the right of William Gerard, one of the heirs referred to in the Gerard Act, to enter one sixteenth of a section of the public lands without the payment of any consideration. It was without dispute that West Coast had selected Little Placer. The *terms* of the Gerard Act were of course not in dispute. The issues before the District Court were issues of law. They arose because the court could not properly read the Gerard Act as an isolated statutory fragment but must look at it as a part of the general system of land laws as such and as judicially applied; because the court must read it in the light of such technical meaning as the terms used therein had acquired in land law and practice; and because the extreme breadth of the phrase "public lands" in the Act compelled a decision as to whether all, or only a part, of the many existing types of public lands were subject to entry under the Act.

The legal materials, statutory and judicial, relevant to the determination of the issues of law may best be understood by a summary of the principal contentions made, and by reference to the authorities, statutory and judicial, principally relied upon, by West Coast and by the Secretary, respectively, upon this appeal. Whether or not all of those authorities were actually submitted to the District Court in the course of the proceeding before it they were existing authorities of which the court was bound to know and which it was bound to consider.

The principal contentions made and the authorities principally relied upon by West Coast are the following:

(1) The Gerard Act is clear and is therefore not subject to construction. United States v. Missouri Pac. R. Co., 278 U.S. 269, 277, 49 S. Ct. 133, 136, 73 L.Ed. 322 (1929).[15]

(2) The Gerard Act constituted a grant *in praesenti*, creating an immediate vested right in the grantees, which became fixed as to the particular lands at the time of their selection by West Coast as the present owner of a Gerard certificate. Rutherford v. Greene's Heirs, 2 Wheat. 196, 4 L.Ed. 218 (U.S.1817);[16]

15. United States v. Missouri Pac. R. Co. is apparently cited for language used in the opinion, as follows, in reference to paragraph 4 of Section 15 of the Interstate Commerce Act, 49 U.S.C.A. § 15(4), relating to the establishment by the Commission of through routes: "The language of that provision is so clear and its meaning so plain that no difficulty attends its construction in this case. . . . We are therefore bound by the words employed and are not at liberty to conjure up conditions to raise doubts in order that resort may be had to construction. It is elementary that where no ambiguity exists there is no room for construction. . . . Construction may not be substituted for legislation. [Citing authorities] . . . But where the language of an enactment is clear and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended."

16. Rutherford v. Greene's Heirs involved an Act passed in 1782 by the legislature of North Carolina "for the relief of the officers and soldiers in the Continental line, and for other purposes therein mentioned". The act gave certain specified quantities of land to the officers and soldiers. The 7th section of the Act

Leavenworth, etc., R. R. Co. v. United States, 92 U.S. 733, 23 L.Ed. 634 (1875).[17]

(3) The Gerard Act recognized an obligation arising out of a contract of April 7, 1792, made by the Government with Joseph Gerard pursuant to inducements held out by General Washington. The issuance of scrip under the Gerard Act constituted another binding contract. McGee v. Mathis, 4 Wall. 143, 18 L.Ed. 314 (U.S.1866);[18] Payne v. Central Pac. Ry.

commenced thus: "And, whereas, in May, 1780, an act passed at Newburn, reserving a certain tract of country to be appropriated to the aforesaid purposes, and it being represented to this present assembly, that sundry families had, before the passing the said act, settled on the said tract of country, Be it enacted, . . . ." The 7th section then granted 640 acres of land to each family which had so settled. The 8th section appointed commissioners to lay off, in one or more tracts, the land allotted to the officers and soldiers. The 10th section enacted "that 25,000 acres of land shall be allotted for, and given to, Major-General Nathaniel Greene, his heirs and assigns, within the bounds of the lands reserved for the use of the army, to be laid off by the aforesaid commissioners, as a mark of the high sense this state entertains of the extraordinary services of that brave and gallant officer." It was contended that these words of the 10th section created no present obligation in the State of North Carolina and no present interest in General Greene, whose heirs were the appellees. But the Supreme Court ruled that the words were "words of absolute donation, not indeed of any specific land, but of 25,000 acres in the territory set apart for the officers and soldiers."

17. In Leavenworth, etc., R. R. Co. v. United States it appeared that Congress, by the Act of March 3, 1863, 12 Stat. 772, to aid in the construction of certain railroads and telegraphs, provided "that there be, and is hereby, granted to the State of Kansas, for the purpose of aiding in the construction . . . every alternate section of land, designated by odd numbers" within certain limits on each side of the railroads. In 1865 the Osage Indians ceded certain lands to the United States. In 1868 the Leavenworth Railroad Company selected lands adjacent to its route and these included those so ceded. Patents were issued by Kansas to that Company. The suit was one by the United States to recover the ceded lands. The Supreme Court ruled that such lands did not pass to the Railroad Company because the 1863 grant covered only lands then owned by the Government. Reliance upon this case by West Coast is apparently for the following statement in the opinion: "It [the Act] creates an immediate interest, and does not indicate a purpose to give in future. There be

and is hereby granted' are words of absolute donation, and import a grant in praesenti. This court has held that they can have no other meaning; and the land department, on this interpretation of them, has uniformly administered every previous similar grant. [Citing cases.] They vest a present title in the State of Kansas, though a survey of the lands and a location of the road are necessary to give precision to it, and attach it to any particular tract." (92 U.S. at 741, 23 L. Ed. 634.)

18. McGee v. Mathis involved the following: In 1850 the United States by Act of Congress granted to the State of Arkansas all swamp and overflowed government lands within its limits, the proceeds to be applied in reclaiming them for cultivation by means of levees and drains. The State accepted the grant and by an Act of the Legislature in 1851 provided for the sale of the lands and for the issue of transferrable scrip receivable for any lands not already taken up at the time of selection by the holder; for contracts for the making of levees and drains; and for the payment of contractors in scrip or otherwise. In the 14th section of the 1851 Act it was also provided that all such swamp and overflowed lands should be exempt from taxation for the term of 10 years, or until they should be reclaimed. In 1855 this 14th section was repealed and provision was made by law for the taxation of swamp and overflowed lands; and in 1857 by another Act of the Legislature a special tax for the making of levees and drains in a particular county was authorized. A scrip holder contested the Acts of 1855 and 1857 as impairing the obligation of the contract of the State with the United States and also the contract between the State and the levee contractors and other lawful holders of swamp land scrip issued under the Act of 1851. The Court held that the levee tax was in violation of the contract between the State and the scrip holder. The Court said:

"It seems quite clear that the act of 1851, authorizing the issue of transferable land scrip and its receipt from locators of land in payment, and the provision in the fourteenth section, offering inducements to purchasers and contractors by exempting from taxation, for ten years or until reclaimed, all the swamp or overflowed lands, constituted a contract be-

Co., 255 U.S. 228, 41 S.Ct. 314, 65 L.Ed. 598 (1921).[19]

(4) Acquisition of lands by virtue of Gerard scrip is not limited to lands subject to private entry after first having been offered at public sale. Chotard v. Pope, 12 Wheat. 586, 6 L. Ed. 737 (U.S. 1827), is not controlling because the Willis Act therein considered refers to a "quantity" of land and the inquiry was as to what kind of land could be entered. The Gerard Act refers to "public lands". The term "entry" as used in the Chotard case can not restrict the rights of a congressional grantee. United States v. Northern Pac. Ry. Co., 204 F. 485, 487 (C.C.D.Mont.1911); Northern Pac. Ry. Co. v. Sanders, 47 F. 604, 607 (C.C.D. Mont.1891).[20] With the passage of the Preemption Act of 1841, 5 Stat. 453, as amended by the Act of March 3, 1843, 5 Stat. 619, the method of disposing of the public domain had so changed that the ruling in the Chotard case in 1827 could no longer be applied; and by 1855, the year of the passage of the Gerard Act, public lands subject to entry included unoffered as well as offered lands. The ruling in the Chotard case was in effect modified by Northern Pacific Railway v. De Lacey, 174 U.S. 622, 19 S.Ct. 791, 43 L.Ed. 1111 (1899).[21] Private bills enacted during 1854 and 1855 demonstrate that Congress did not regard general grants of public lands as restricted to lands "open to private entry" for Congress, when it desired such a restriction, expressly used restrictive terms; this shows that Congress in 1855 regarded the Chotard case as not reflecting the law. The legislative history of the Gerard Act shows that Congress expressly declined to include therein the limitation "subject to private entry".[22]

(5) The Gerard Act is not to be taken as ex-

tween the State and the holders of the land scrip issued under the Act.

" * * * Every piece of scrip was a contract between the State and the original holder and his assigns." (4 Wall. at 156, 18 L.Ed. 314.)

19. In Payne v. Central Pac. Ry. Co., the Act of July 25, 1866, c. 242, 14 Stat. 239, granted lands for railroad construction. A selection of indemnity lands had been made, but before formal approval thereof by the Secretary of the Interior, he withdrew for a waterpower site the lands selected. The suit was to enjoin the Secretary and the Commissioner of the General Land Office from canceling the selection. The Court held that by virtue of the selection the rights of the Railway Company had attached and that the withdrawal by the Secretary was illegal and that the Secretary should be required to dispose of the selection on its merits, unaffected by the withdrawal. In brief, the decision stands for the proposition that a withdrawal by the Government of indemnity lands *after* they have been selected by the railroad company is void. The theory of the decision was that on filing a selection in full faith and compliance with the requisite for a patent to a particular tract the railroad becomes the equitable owner thereof, and for that reason a subsequent withdrawal of the lands selected is legally ineffective. The Court said: "Rightly speaking, the selection is not to be likened to the initial step of one who wishes to obtain the title to public land by future compliance with the law, but rather to the concluding step of one who by full compliance has earned the right to receive the title."

20. In United States v. Northern Pac. Ry. Co., by the Act of May 1, 1888, 25 Stat. 133, ratifying a treaty with Indian tribes in Montana, it was provided that land ceded to the United States thereby should be a part of the public domain and open

to the operation of certain specified land laws but not "to entry under any other laws regulating the sale or disposition of the public domain." By the Act of March 3, 1911, 36 Stat. 1080, the previous Act was amended so as to provide that the land should be opened to the operation of all of the laws regulating the entry, sale or disposal of the public domain and that "no patent shall be denied to entries heretofore made in good faith under any of the laws regulating the entry, sale, or disposal of public lands, if said entries are in other respects regular and the laws relating thereto have been complied with." Under a railroad grant made prior to the amendment the lands ceded by the Indian tribes were selected as lieu lands and the selections were approved and patents issued. It was held that the patents were validated by the amendment. The theory of the decision apparently was that the word "entry" as used in the public land laws covers all methods by which a right to acquire title to public lands may be initiated and therefore includes within its meaning the filing of selections of lieu lands under a railroad grant.

Apparently this case and Northern Pacific Ry. Co. v. Sanders are relied upon by West Coast for the proposition that the word "entry" is used in the land laws in different senses and is therefore not to be confined to the meaning given to it in the Chotard case.

21. Northern Pacific Railway v. De Lacey is cited because of a reference therein to "public lands" as including "unoffered lands", and is relied upon by West Coast as supporting the proposition that Gerard scrip can be applied to unoffered as well as offered lands. The case is stated in footnote 34.

22. In support of the contention that the legislative history of the Gerard Act shows that Congress declined to include

cluding mineral lands in California. Such lands can be selected there and in other states under Gerard scrip. In 1850 there was no settled policy of Congress requiring a mineral reservation or exclusion to be read into a general land grant. Work v. Louisiana, 269 U.S. 250, 46 S.Ct. 92, 70 L.Ed. 259 (1925).[23] There was no such policy in 1853, since Ivanhoe Mining Company v. Keystone Consolidated Mining Company, 102 U.S. 167, 26 L.Ed. 126 (1880), which read a mineral land exclusion into the Act of March 3, 1853, 10 Stat. 244, recognized *that there was no such policy until the Act of July 26, 1866, 14 Stat. 251*, the ruling in the Ivanhoe Mining Company case being based upon the special terms of the 1853 statute.[24] No settled policy requiring a mineral reservation or exclusion to be read into a general land grant was established by Congress between 1850 and the date of the Gerard Act, 1855. In thirty-two private land grant acts of Congress, between 1845 when the Gerard Act was introduced and 1855 when it became law, Congress expressly excluded mineral lands in one and not in the others, thus demonstrating that it intended to deal with each land grant separately, *i.e.* without a settled policy. Therefore, if Con-

gress had intended to exclude mineral lands in the Gerard Act it would have done so expressly. The Act of July 26, 1866 did not establish a settled policy to reserve mineral lands to the United States but on the contrary made them free and open to exploration. And whether or not the Act of 1866 established a general policy for the disposal of mineral lands, the Gerard Act is an exception because the Act of 1866 applies to lode, not placer, claims. It is ruled in Oklahoma v. Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771 (1922), that Section 2319 of the Revised Statutes applies only where the United States has indicated that lands are held for disposal under the land laws, not where the United States directs disposition under "other laws". The Gerard Act is an "other law".[25] Neither the Act of March 3, 1853, involved in the Ivanhoe Mining Company case, nor the Act of July 26, 1866, established a policy to dispose of mineral lands only under statutes dealing expressly with them. Nothing in the Gerard Act or in its legislative history indicates an intention on the part of Congress to exclude mineral lands. The Committee on Claims of the 33d Congress recommended that the Gerard Act limit selection to

therein the limitation "subject to private entry" West Coast asserts that:

"The first Gerard bill of 1845, H.R. 644, 28th Congress, 2d Session, contained no restrictive language such as 'subject to private entry'.

"The second Gerard bill, H.R. 111, 30th Congress, 1st Session, was committed to the House of Representatives on January 24, 1848, without a clause limiting selection to 'land subject to private entry' (The Congressional Globe, Vol. 19, p. 237).

"On May 26, 1848, the Committee of the Whole House considered the bill and amended it before its passage by the House (The Congressional Globe, Vol. 19, p. 787).

"The House Bill as amended was passed and sent to the Senate Committee of Claims which reported it to the Senate 'without amendment', but now containing the limiting words 'land subject to private entry'. (The Congressional Globe, Vol. 19, p. 190, Jan. 9, 1849).

"The bill died in the Senate.

"The final Gerard Act (10 Stat. 849) omitted the 'subject to private entry' exception."

23. Work v. Louisiana involved the Act of March 2, 1849, 9 Stat. 352, which "granted" to the State of Louisiana "the whole of those swamp and overflowed lands, which may be or are found unfit for cultivation". The suit was by Louisiana to restrain the Secretary of the Interior from rejecting the State's claim under the Act for lack of a showing that the lands were not mineral in character. It was urged in behalf of the Secretary that al-

though the Act contained no express exception or reservation of mineral lands, such a reservation should be read into it by reason of a settled policy of the United States of withholding mineral lands from disposal except under laws expressly including them. The Court ruled that there was no such settled policy at the time of the enactment of the 1849 statute, and that the grant was *in praesenti*, giving the State an inchoate title to all of the swamp and overflowed lands, without reference to their mineral character, which title became perfect as of the date of the Act when the granted land had been identified as required.

In Work v. Louisiana the Court made the same ruling with reference to the Act of September 28, 1850, 9 Stat. 519, granting swamp lands to Arkansas.

24. Ivanhoe Mining Company v. Keystone Consolidated Mining Company is stated in footnote 1.

25. Section 2319 of the Revised Statutes, 30 U.S.C.A. § 22, provides: "All valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining-districts, so far as the same are applicable and not inconsistent with the laws of the United States."

four states (Ohio, Michigan, Indiana, Illinois). Congress, in enacting the bill which became the Gerard Act, struck out this proposed provision; hence selection was left open under the Gerard Act in all states.

(6) Land granted by way of reward for military service can not be said to have been sold. Five Per Cent. Cases (Iowa v. McFarland and Illinois v. McFarland), 110 U.S. 471, 4 S.Ct. 210, 28 L.Ed. 198 (1884).[26] Therefore selection under the Gerard Act can be made without reference to Section 2318 of the Revised Statutes, 30 U.S.C.A. § 21, providing that "in all cases lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law."

(7) The Mineral Leasing Act of February 25, 1920, providing, *inter alia*, for the disposition by lease of deposits of sodium in lands belonging to the United States, does not foreclose the selection of Little Placer under the Gerard Act; the grant under the latter Act is sufficiently comprehensive to include mineral lands. Moreover, the rights of West Coast are not the general statutory rights of a member of the public; they are special rights under a special grant. The claim of West Coast is to a fee simple in a designated tract of public lands; statutory procedure prescribed for persons seeking to negotiate for a lease or permit relating solely to mineral rights in the public lands is not applicable. Also, the Leasing Act "does not declare that the minerals described therein, located in *any particular State, cannot be selected* in accordance with the terms and provisions of a *previous* grant of Congress i.e., the Gerard Act of 1855; nor that these minerals were reserved from *previous* grants." And the imposition of such a limitation in 1947 (the year of the West Coast selection of Little Placer) would violate the due process clause of the Constitution. Even if the Gerard Act conflicted with the Leasing Act the former would control under the rule that a general act is not to be construed as applying to cases covered by a prior special act on the same subject. Rodgers v. United States, 185 U.S. 83, 89, 22 S.Ct. 582, 46 L.Ed. 816 (1902). Since the Gerard Act "created a present vested right, that is a grant of public land '. . . in full payment for the patriotic services'", when the land was identified by selection the title related back to the date of the original grant with the same effect as if selection had been made in 1855. West v. Lyders, 59 App.D.C. 122, 36 F.2d 108 (D.C.Cir.1929).[27]

26. In the Five Per Cent. Cases the Governors of Iowa and Illinois relied, respectively, upon the provisions of the Act of March 3, 1845, Chapter 76, 5 Stat. 789, and the Act of April 18, 1818, Chapter 67, 3 Stat. 428, relating to the admission of those states into the Union. The Acts provided that "Five per cent. of the net proceeds" of public lands lying within such states and afterwards sold by Congress should be appropriated for certain public uses of the states. The Governors contended that the states were thereby entitled to five percent of the value of lands disposed of by Congress in satisfaction of military land warrants. The Supreme Court ruled to the contrary. *Inter alia* it said: "The question before us is not whether the promise by the government of a bounty in land or money to persons entering the military service is a contract for valuable consideration; but whether, when carried into effect, it constitutes a sale by the government; and it is quite clear that land granted by way of reward for military services has never been treated, in the legislation of the United States upon the subject, as sold, but has always been considered as analogous to money paid in a gross sum by way of bounty."

27. West v. Lyders involved the Act of April 5, 1872, 17 Stat. 649, which required one Valentine to convey to the United States certain California lands and provided that "in lieu thereof, the claimant, or his legal representatives, may select, and shall be allowed, patents for an equal quantity of the unoccupied and unappropriated public lands of the United States, not mineral . . . ." So called Valentine scrip was issued under that Act. The appellee, Lyders, who had by mesne conveyances acquired such scrip, selected thereunder Whaler Island in Crescent City Bay, Del Norte County, California. Thereafter, the President by Executive Order withdrew the island from "settlement, sale, location, entry or other form of appropriation, subject, however, to existing rights pending classification and in aid of legislation". Still later, the President, by a second Executive Order, withdrew the island "in aid of legislation and in connection with the improvement of the harbor at Crescent City, California". Still later, Congress, by the Act of March 4, 1927, 44 Stat. 1845, authorized the Secretary of the Interior to patent the island to the County of Del Norte for the purpose of a public wharf. Thereafter, the Commissioner of the General Land Office rejected Lyders' selection, and this rejection was affirmed by the Secretary. At the instance of Lyders, the then named Supreme Court of the District of Columbia (now the United States District Court for the District of Columbia) issued an injunction restraining the Secretary from issuing a patent to the island to the County of Del Norte and requiring him to give full force and legal effect to Lyders' selection, notwithstanding the Executive Orders and the Act of March 4, 1927. This Court of Appeals affirmed the issuance of the injunction. The court ruled that the satisfaction of the Government's obligation to

This relation back cuts off the application of subsequent general legislation such as the Mineral Leasing Act.

(8) The Act of March 2, 1899, 25 Stat. 854, 43 U.S.C.A. § 700, withdrawing from private entry all public lands except those in Missouri can not, because of the due process clause of the Constitution, cut down rights acquired under the Gerard Act.

(9) The saving clause of Executive Order No. 6910 of November 26, 1934, "the withdrawal hereby effected is subject to existing valid rights", preserves the rights of West Coast under the Gerard Act. Stockley v. United States, 260 U.S. 532, 43 S.Ct. 186, 67 L.Ed. 390 (1923), so rules with respect to an Executive Order of December 15, 1908, which saved "existing valid claims";[28] and the Secretary of the Interior (Chapman) so ruled in the Santa Fe Pacific Railroad Company decision, 56 I.D. 376 (1938).[29] Even in the absence of

the saving clause in Executive Order No. 6910 the rights of West Coast under the Gerard Act could not be diminished by the withdrawal. To give the Executive Order the effect of diminishing rights under the Gerard Act would limit West Coast to a few acres of land in Missouri and would, in view of United States v. Northern Pac. Ry. Co., 256 U.S. 51, 66–67, 41 S.Ct. 439, 442, 65 L.Ed. 825 (1921), deprive it of a substantial property right contrary to the due process clause of the Constitution.[30] The rights of West Coast under the Gerard Act are co-extensive with the entire United States and embrace all types of land. All that was necessary to give precision to the title of the Gerard grantees, and their assignees, was selection, Rutherford v. Greene's Heirs, supra, and surrender of the certificate (scrip) that made West Coast the equitable owner of Little Placer. Hartmann v. Warren, 70 F. 946 (C.C.D.Minn.1885).[31]

Valentine, arising by virtue of the issuance of the scrip to him, gave him a vested right to the selection of any unsettled or unappropriated public land in the United States in a quantity equal to the acreage which he had conveyed, and that when he, or his assigns, made a selection of unappropriated lands, "he was merely exercising the vested right which he had already acquired from the government, and the vested right acquired, when completed in a valid selection, relates, not merely to the date of selection, but back to the date of the issuance of the scrip."

28. Stockley v. United States is relied upon by West Coast for the following statement, in the opinion, concerning the phrase "existing valid claims" in a saving clause of an Executive Order of December 15, 1908: "Obviously this means something less than a vested right, such as would follow from a completed final entry, since such a right would require no exception to insure its preservation. The purpose of the exception evidently was to save from the operation of the order claims which had been lawfully initiated and which, upon full compliance with the land laws, would ripen into a title. * * * Since it is conceded that Stockley made such an entry in 1905 and his compliance with the requirements of the homestead law prior to the withdrawal order is not questioned, it follows that he had, when that order was issued, an existing valid claim, within the meaning of the exception. The action of the Commissioner of the General Land Office, therefore, in directing a contest against Stockley's entry three years after the issuance to him of the receiver's receipt was unauthorized and void." (260 U.S. at 544, 43 S.Ct. 189.)

29. The Santa Fe Pacific case involved Executive Order No. 6910 of November 26, 1934. In that case it appeared that lands withdrawn included indemnity lands under a railroad construction grant made to the predecessor in interest of Sante Fe Pacific, and that such lands were themselves insufficient to fill up place land losses. The Secretary ruled that the right of Santa Fe Pacific to the indemnity lands was unaffected by the withdrawal order.

30. United States v. Northern Pac. Ry. Co., commonly referred to in the reports as the Forest Reserve Case, holds that where indemnity lands are insufficient to fill up place land losses withdrawal of the same by the Government *prior* to selection is legally ineffective. West Coast relies upon this case for a statement in the opinion: "Giving effect to all that bears on the subject, we are of the opinion that after the company earned the right to receive what was intended by the grant it was not admissible for the Government to reserve or appropriate to its own uses lands in the indemnity limits required to supply losses in the place limits. Of course, if it could take part of the lands required for that purpose, it could take all and thereby wholly defeat the provision for indemnity. But it cannot do either. The 'substantial right' conferred by that provision . . . cannot be thus cut down or extinguished."

31. In Hartmann v. Warren, Warren located land under scrip issued pursuant to an Indian treaty of which he was a beneficiary. Thereafter Hartmann made application to enter the same lands under so called Porterfield warrants. A patent was issued to Warren and was upheld in a District Court contest between Hartmann and Warren. West Coast

(10) The rejection by the Secretary of the Little Placer selection was contrary to the clear meaning of the Gerard Act. After West Coast had made its selection and surrendered its certificate there remained for the Secretary to perform nothing but the ministerial duty of approving the selection and issuing a patent. The Secretary may therefore not exercise discretion to limit or defeat the rights of West Coast. Wilbur v. United States ex rel. Krushnic, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930).[32] Where the words of a statute are clear it must prevail notwithstanding an opposite opinion by an officer of a governmental department. The Secretary's decision is contrary to the mandate of Congress, the intent, purpose, and plain language of the Gerard Act, and the law as it existed in 1855 when the Gerard rights vested. It is the function of mandamus to correct the Secretary's obvious error.

The principal contentions made, and the authorities principally relied upon, by the Secretary of the Interior are:

(1) Little Placer was not, in 1947 when West Coast made its selection, nor has it ever been, subject to entry under Gerard Act scrip.

The land in question has never been publicly offered for sale or open to private entry; and Chotard v. Pope, 12 Wheat. 586, 6 L.Ed. 737 (U. S.1827), construing the Willis Act of 1820, which allowed Willis to "enter" lands of the United States, rules that only lands remaining available for private sale after first having been offered at public auction can be entered. The Chotard case stands as present law, having been cited by the Supreme Court in Eldred v. Sexton, 19 Wall. 189, 195, 196, 22 L. Ed. 146 (U.S.1873),[33] and is not distinguishable from the instant case because the Willis Act refers to "land" and the Gerard Act to "public land". If there is a difference the Willis Act is the broader. The point to be decided in the Chotard case was not and in the instant case is not whether claimants under the parallel statutes involved in the two cases acquired a right to enter public land, or what acts would constitute an entry, but what class of land the right to enter could be exercised upon. The Pre-emption Acts of 1841 and 1843 as construed by Northern Pacific Railway v. De Lacey, 174 U.S. 622, 19 S.Ct. 791, 43 L.Ed. 1111 (1899), demonstrate that "private entry" had no meaning in 1855 (the date of the Gerard Act) different from that which it had at the time of the Chotard decision in 1827.[34] Con-

cites the case for the statement in the opinion: "But the scrip, upon its face, entitled Warren to locate it upon public lands; and, when the entry was made, it was prima facie valid, and the lands became appropriated."

**32.** In citing Wilbur v. United States ex rel. Krushnic, West Coast relies upon a quotation by this Court of Appeals *(sub nom.* United States ex rel. Krushnic v. West, 58 App.D.C. 332, 30 F.2d 742, 747) from Simmons v. Wagner, 101 U.S. 260, 261, 25 L.Ed. 910 (1879): "Where the right to a patent has once become vested in a purchaser of public lands, it is equivalent, so far as the government is concerned, to a patent actually issued. The execution and delivery of the patent after the right to it has become complete are the mere ministerial acts of the officers charged with that duty."

**33.** In Eldred v. Sexton a congressional land grant to aid the construction of a railroad in Wisconsin provided that the even numbered sections adjacent to the route should be offered for sale at $2.50 per acre. They were so offered, but not being sold remained subject to private entry at that amount. By a subsequent Joint Resolution Congress authorized a change of route of the railroad, and provided that the even numbered sections adjacent to the original route should be sold at $1.25 per acre. Before the lands in such sections were offered for sale at public auction at the new price, the register and receiver of the local land of-

fice permitted Eldred to enter them at the new price. Later his entries were canceled upon the ground that the lands were not subject to private entry at $1.25, and they were then offered at public sale at that price and not being sold were subsequently purchased at private entry at that price by Sexton, to whom patents were issued. The suit was by Eldred to have Sexton declared a trustee and to require him to surrender the patents. The ultimate holding by the Supreme Court of the United States, reviewing a decision of the Supreme Court of Wisconsin, was that the lands in question were not available for private entry at $1.25 per acre until they had first been offered at that price at public auction, and that therefore Eldred obtained no title. The Court, citing the Chotard case, ruled that since the Act of April 24, 1820, 3 Stat. 566, it has been "a fundamental principle underlying the land system of this country that private entries are never permitted until after the lands have been exposed to public auction, at the price for which they were afterwards subject to entry."

**34.** As is noted in footnote 21, West Coast cites the De Lacey case because of the statement therein that after the Act of April 24, 1820 "the public lands came to be spoken of as 'unoffered' lands or those which had not been exposed to public sale and 'offered' lands or those which had been so exposed and remained unsold" (174 U.S. at 629, 19 S.Ct. at 794). West Coast contends that by that state-

trary to the contention of West Coast, the legislative history of the Gerard Act affirmatively shows that Congress used the word "enter" in the Chotard case sense.[35]

(2) Mineral land in California has never been subject to disposition except under laws expressly providing for disposal of such land. In the Act of March 3, 1853, 10 Stat. 244, considered in Ivanhoe Mining Company v. Keystone Consolidated Mining Company, Congress extended to California the public sale and pre-emption acts but excepted mineral land from disposal. The Ivanhoe Mining Company case rules that the 1853 Act fixed a definite policy in California of withholding mineral land from all grants until a definite mineral policy was decided upon, and that a grant of sections 16 and 36, in each township, of the public lands to the State of California for school purposes did not cover mineral lands.[36] United States v. Sweet, 245 U.S. 563, 38 S.Ct. 193, 62 L. Ed. 473 (1918), rules that the Utah Enabling Act of 1894 granting school sections to Utah, silent as to minerals, did not pass mineral lands

ment the Supreme Court recognized that at the time of the passage of the Gerard Act in 1855 (*i.e.* at all times since 1820) the "public lands" included unoffered as well as offered lands. Therefore, according to the contention of West Coast, the words in the Gerard Act "they and their heirs are hereby permitted to enter, each one of them severally, or his or their heirs, one section of public lands" permits those heirs and their assignees to enter lands which had not been offered at public sale—and this notwithstanding that the Supreme Court in Chotard v. Pope had defined "entry" to apply only to those lands which had been offered at public sale and remained unsold.

In opposition to this the Secretary contends that the De Lacey case does not alter the Chotard definition of "entry". The Secretary refers to the following statement in the opinion of the Court in the De Lacey case: "Taking these two acts of 1841 and 1843 and reading them together, it is seen that there was a difference between unoffered and offered lands by reason of the fact that on unoffered lands the right or privilege to secure land by a preëmption filing continued up to the commencement of the public sale whenever that might be, and *if that right or privilege had not been exercised and the land was offered at public sale and not sold, it then became subject to private entry by the first applicant*, while on offered lands the right or privilege to secure them by a preëmption filing continued for twelve months after the date of the settlement, and if the preëmptor failed to file the declaratory statement or make the proper affidavit within the twelve months, 'the tract of land so settled and improved shall be subject to the entry of any other purchaser.'" (Emphasis supplied.) The Secretary contends that by the italicized words the Court recognized that "unoffered" lands are not subject to private entry before public auction and thus recognized the Chotard definition of "entry".

In Northern Pacific Railway v. De Lacey the question was whether or not there was, at the time of a railroad construction land grant, an outstanding pre-emption claim which would interfere with the passing of title to the railroad. It was in deciding that question that the Supreme Court made the statement above quoted.

35. The assertions of the Secretary in opposition to the contentions of West Coast, stated in footnote 22, concerning the legislative history of the Gerard Act are, in substance and effect, the following:

The legislative history relied upon by West Coast is not the legislative history of the bill which became the Gerard Act in the 33d Congress, but that of a similar bill in the 30th Congress. The legislative history of the Gerard Act itself in the 33d Congress shows that the Chairman of the Committee which reported it to the House of Representatives, where it originated, stated to the House, "The committee had some trouble in fixing on the kind of relief to be afforded, but after inquiring, and receiving much information, it came to the conclusion to report a bill authorizing each one of Gerard's heirs, three in number, to enter one section of any of the public land open to private entry." (33d Cong. 1st Session, Part 3, page 1732.) Even if the matter relied upon by West Coast were part of the true legislative history of the Gerard Act, it would not support the conclusion that West Coast draws from it. From the mere fact that a bill before the 30th Congress limiting selection to lands subject to private entry failed of passage, West Coast appears to argue that Congress "turned it down" because it did not like the words "subject to private entry". But the mere failure of a bill to pass does not reveal the reason for its not passing. Moreover, the Senate never made any disclosure of its view with regard to the bill. It did not reject it. As West Coast states, the bill "died" in the Senate. The fact is it was never reached for consideration, so West Coast's deduction from its mere failure of passage is unjustified.

36. Ivanhoe Mining Company v. Keystone Consolidated Mining Company is stated in footnote 1.

because at that time there had been established a general policy initiated in 1866 of disposing of mineral lands only under laws especially providing for their disposal.[37] Under those authorities West Coast's permissive right to enter did not include the right to enter mineral lands in California. The decision in Work v. Louisiana that the Act of March 2, 1849, granting swamp and overflowed lands to Louisiana did not exclude mineral lands, does not undermine the decisions in the Ivanhoe Mining Company and Sweet cases.[38] The Supreme Court distinguished the Sweet case by pointing out that the Utah Enabling Act of 1894 was passed after the establishment long prior thereto of a settled policy in respect of mineral lands by which they were withheld from disposal save under laws expressly including them; and distinguished the Ivanhoe Mining Company case by pointing out that that decision, involving the 1853 Act, was not upon the ground that there was at that time any settled and general policy of reserving mineral lands, but, on the contrary, was upon the ground that the discovery in 1849 that California was rich in precious metals had led to the adoption by Congress, in reference to California, of a local policy "by which, unlike the ordinary laws for disposing of public lands in agricultural states, the mineral lands in that State were uniformly reserved from sale, preemption and grants for public purposes." It has long been recognized by the commentators that mineral lands are not subject to scrip selection. I Lindley, Mines, § 211 (3rd Ed.1914); Ricketts, American Mining Law, Bulletin No. 123, California State Division of Mines, Vol. 1, Page 39. The rejection of the

West Coast entry by the Secretary and the trial court conforms to a long and uniform administrative practice dating from 1880 and to the views of such text writers.

(3) Even assuming that Little Placer was open to private entry, it was validly withdrawn from such entry both by Congress and Executive Order prior to 1947.

(a) By the Act of March 2, 1889, 25 Stat. 854, Congress withdrew from private entry all lands of the United States except those in Missouri; and by the Act of May 18, 1898, 30 Stat. 418, 43 U.S.C.A. § 675, declared all public lands in Missouri open to sale and private entry regardless of whether such lands had been previously offered at public auction. One thousand and eight acres of public land were available to entry in Missouri in 1947 when West Coast made application to enter its scrip on Little Placer. The Gerard Act did not guarantee that any specific land would be made or kept available, and did not guarantee to deliver valuable mineral land. It promised merely to make available land which was open to entry by others upon payment of $1.25 per acre, and clothed the Gerard heirs and their assignees with no greater rights than such others except that it relieved them from the payment of any consideration. Since acreage was open in Missouri in 1947 West Coast's right has not been breached. West Coast concedes that Congress could withdraw Little Placer "for public use"; the withdrawing of mineral lands from entry for the purpose of securing to the Government the benefit of minerals is a public use. United States v. Midwest Oil Company, 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673 (1915).[39] But apart

---

**37.** In United States v. Sweet, Section 6 of the Utah Enabling Act of July 16, 1894, 28 Stat. 107, provided that upon the admission of the State into the Union "sections numbered two, sixteen, thirty-two, and thirty-six in every township of said proposed State . . . are hereby granted to said State for the support of common schools . . . ." Thus the statute neither expressly included mineral lands nor expressly excluded them. In an action by the United States to quiet title to Section thirty-two of a designated township in a designated county in Utah as against a claim asserted by an assignee of the State under the school land grant, it appeared that the land in question was valuable for coal and had been known to be such since before admission of Utah to the Union. It was without dispute that land valuable for coal is mineral land within the meaning of the public land laws. The ultimate issue was whether or not the school land grant to Utah embraced mineral lands. The Supreme Court held that it did not. It ruled that the grant to Utah must be read in the light of the mining laws, of a school land indemnity law (Act of February 20, 1891, 26 Stat. 796, 43 U.S.C.A. §§ 851, 852), and of the settled public pol-

icy respecting mineral lands, and not as if the grant constituted the sole evidence of the legislative will; that when so read the grant did not disclose a purpose to include mineral lands although it was couched in general terms adequate to embrace such lands if there were no statute or settled policy to the contrary. Specifically, the Court said: "Although couched in general terms adequate to embrace such lands if there were no statute or settled policy to the contrary, it contains no language which explicitly or clearly withdraws the designated sections, where known to be mineral in character, from the operation of the mining laws, or which certainly shows that Congress intended to depart from its long prevailing policy of disposing of mineral lands only under laws specially including them. It therefore must be taken as neither curtailing those laws nor departing from that policy." (245 U.S. at 572–573, 38 S.Ct. at 195.)

**38.** Work v. Louisiana is stated in footnote 23.

**39.** The decision in United States v. Midwest Oil Company involved the following: The rapid extraction of oil in California under the Act of February 11, 1897, 29

from this concession by West Coast, it is established that Congress has power to withdraw public land from all forms of entry. United States v. Midwest Oil Company. This power of withdrawal was recognized in the opinion in Chotard v. Pope, where the Court referred to the previous (*i.e.* previous to the Willis Act) appropriation of lands, whether by public sale or by withdrawal from the mass of lands offered for sale. During the period 1850 to 1864 Congress made railroad construction grants of large acreages of public lands, Great Northern Ry. Co. v. United States, 315 U.S. 262, 273, 62 S.Ct. 529, 86 L.Ed. 836 (1942), and since 1855 (the year in which the Gerard Act was passed) has patented large acreages under the pre-emption and homestead laws. The cases relied upon by West Coast for the proposition that the Gerard Act made a grant *in praesenti* do not support West Coast's contention. In Rutherford v. Greene's Heirs no question as to whether or not the North Carolina Act for the relief of officers and soldiers made a grant *in praesenti* was before the Court. The sole question in the case was whether or not the provision "twenty-five thousand acres of lands shall be allotted . . . to Nathaniel Greene" required that "there shall be" another enactment. Since the lands

Stat. 526, permitting exploration and purchase of oil lands by citizens, resulted in a withdrawal recommendation by the Secretary of the Interior. Pursuant thereto the President, on September 27, 1909, issued an Executive Order withdrawing certain public lands in California and Wyoming from disposition under the public land laws. Shortly thereafter, the predecessor in interest of Midwest Oil discovered oil on lands covered by the withdrawal order, extracted large quantities of oil, and filed a location certificate. A bill in equity by the Secretary of the Interior seeking recovery of the land and an accounting for the oil extracted resulted in a decree of dismissal from which the Secretary appealed. The question in the case was whether or not the Executive could validly withdraw lands from private acquisition which Congress had theretofore opened to occupation. The Supreme Court sustained such withdrawal power. The Court ruled that the power of the Executive to withdraw lands had long been recognized and had never been repudiated by Congress. The Court reviewed numerous specific instances of the exercise of withdrawal power by the Executive and in respect thereof said: "These orders were known to Congress, as principal, and not in a single instance was the act of the agent disapproved. Its acquiescence all the more readily operated as an implied grant of power in view of the fact that its exercise was not only useful to the public but did not interfere with any vested right of the citizen.". The Court concluded that in view

had been allotted and title transferred the question as to when title vested was not involved. That case, so far as the question as to when title would vest is concerned, is a ruling against the position of West Coast. The railroad land grant cases, such as Leavenworth, etc., R. R. Co. v. United States, do not aid West Coast. Those cases involve place lands and indemnity lands. The grants of the former are grants *in praesenti* and the cases uniformly hold that, upon the filing of the map of definite location, title vests as of the date of the grant. But grants of place lands are true grants, as distinguished from mere rights to enter, and in the Leavenworth case, relied upon by West Coast, the language of the Act was "there be and is hereby granted". So far as indemnity lands are concerned, the railroad takes no title until the right of selection—to fill up place land losses—is exercised, except in instances in which there is a deficiency in indemnity lands. United States v. Southern Pac. R. R. Co., 223 U.S. 565, 570, 32 S.Ct. 326, 327, 56 L. Ed. 553 (1912) ;[40] Southern Pacific Railroad Co. v. Bell, 183 U.S. 675, 681–682, 22 S.Ct. 232, 46 L.Ed. 383 (1902) ;[41] Krug v. Santa Fe Pac. R. Co., 81 U.S.App.D.C. 288, 158 F.2d 317 (D.C. Cir.1946).[42] But that exception is not involved in the instant case because at the time

of the recognized and long established practice, the power of withdrawal existed even in the absence of express grant of withdrawal power by Congress. Though the Court in the Midwest case actually ruled only upon the validity of an Executive withdrawal order, the Secretary apparently, at this point in his argument, relies upon the decision as recognizing also, by implication, power in Congress itself to withdraw lands theretofore opened to occupation.

40. The Secretary of the Interior cites United States v. Southern Pac. R. R. Co. for the following statement in the opinion of the Court: "An indemnity grant, like the residuary clause in a will, contemplates the uncertain and looks to the future. What a railroad is to be indemnified for may be fixed as of the moment of the grant, but what it may elect when its right to indemnity is determined depends on the state of the lands selected at the moment of choice. Of course the railroad is limited in choosing by the terms of the indemnity grant, but the so-called grant is rather to be described as a power. Ordinarily no color of title is gained until the power is exercised."

41. The Secretary cites Southern Pacific Railroad Co. v. Bell for a statement in the opinion of the Court similar to the statement quoted in footnote 40 from the opinion in United States v. Southern Pac. R. R. Co.

42. The Secretary cites Krug v. Santa Fe Pacific R. Co. for the statement in the

(1947) of the attempted selection of Little Placer lands in Missouri were available for selection. The statement in West v. Lyders, 59 App.D.C. 122, 36 F.2d 108 (D.C.Cir.1929)—that when the holder of Valentine scrip made a selection of unappropriated public lands "he was merely exercising the vested right which he had already acquired from the government, and the vested right acquired, when completed in a valid selection, relates, not merely to the date of selection, but back to the date of the issuance of the scrip"—is a dictum because the only question in the case was as to the effect of the withdrawal *after* selection. And in Lyders v. Ickes, 65 App.D.C. 379, 84 F.2d 232 (D.C.Cir.1936), this court, upon the ground that the island in question had been withdrawn by the Government prior to selection under the Valentine scrip, sustained a rejection of the entry.[43]

(b) Even if the Congressional withdrawal of March 2, 1889 had not been made, the lands included in the Little Placer selection were validly withdrawn by Executive Order No. 6910 of November 26, 1934.[44] That withdrawal was ratified by the Act of June 26, 1936 (The Taylor Grazing Act) which made specific reference to it and authorized the Secretary of the Interior to open to entry any of the withdrawn lands which he found to be suitable "for acquisition and satisfaction of any outstanding . . . scrip rights." Withdrawal for classification is valid under United States v. Midwest Oil Co. The effect of the Executive Order No. 6910 withdrawal for classification can not be avoided by West Coast on the basis of the clause saving "existing valid rights" because that clause refers to rights in specific property established as of the date of the order. The decision in Stockley v. United States, 260 U.S. 532, 43 S.Ct. 186, 67 L.Ed. 390 (1922), does not sustain the contention that West Coast had a right in Little Placer in 1934, the year of the withdrawal order, for the decision dealt with a homestead entry whereunder the entryman had prior to the withdrawal complied with all requirements and acquired a possessory right. West Coast is also not aided by United States v. Northern Pac. Ry. Co., 256 U.S. 51, 41 S.Ct. 439, 65 L.Ed. 825 (1921), or by Santa Fe Pacific Railroad Company, 56 I.D. 376 (1938). In the Northern Pacific case there was at the time of the withdrawal a deficiency in indemnity lands to fill up place

land losses. The Secretary's decision in the Santa Fe Pacific case was rested upon the Northern Pacific decision. The ruling in the latter case was recognized in Krug v. Santa Fe Pac. R. Co. and in Chapman v. Santa Fe Pac. R. Co., 90 U.S.App.D.C. 34, 198 F.2d 498 (D.C.Cir.1951). Since more than enough land was open to entry in 1947—in Missouri—to satisfy West Coast's 40 acre certificate, those cases are not applicable. Even if an actual deficiency had resulted from the withdrawal by Executive Order No. 6910, Congress, in the Taylor Grazing Act, made provision for relieving against the defeat of outstanding scrip rights by authorizing the Secretary to classify withdrawn lands as suitable for scrip entry. If West Coast does not desire to enter lands in Missouri it can request the Secretary to classify additional land as suitable for scrip location. Thus the permanent frustration of selection rights which underlies the decision in the Northern Pacific case is not presented by the Executive withdrawal, Congress having provided—in the Taylor Grazing Act—a method of relief. The Secretary will, of course, not classify Little Placer as suitable for entry for the reason set out in his decision of November 18, 1947, *i.e.* because the land is mineral land in California. Even apart from the lack of power in the Secretary to dispose of mineral lands except by reservation of the minerals (Act of June 17, 1914, 38 Stat. 509) he would be justified in rejecting an entry of such valuable property as Little Placer. The United States has not contracted to deliver any specific land or to deliver mineral land of high value. West Coast's right under the Gerard Act is merely to enter without payment of any consideration land open to others at $1.25 per acre.

(4) The duty of the Secretary was not ministerial; it involved the exercise of discretion and judgment. Construction of the public land laws was necessary. Hence the Secretary's action may not be controlled by mandamus. As said in Hammond v. Hull, 76 U.S.App.D.C. 301, 131 F.2d 23, 25 (D.C.Cir.1942): "When the performance of official duty requires an interpretation of the law which governs that performance, the interpretation placed by the officer will not be interfered with, certainly, unless it is clearly wrong and the official action arbitrary and capricious." The instant case is such a case; it can not be said that the Sec-

---

opinion of this Court of Appeals that "while it is true that, as a general rule, selection is necessary to vest any right to specific indemnity lands in the grantee, the Supreme Court has long recognized an exception where there is a deficiency of indemnity land to satisfy losses in place."

43. Lyders v. Ickes must be read in connection with West v. Lyders, which is stated in footnote 27. In Lyders v. Ickes it appeared that the island in question in the two cases had been withdrawn for public use by a Congressional Act in 1918, 40 Stat. 910. The Valentine scrip had been issued in 1872. The selection

of the island under the Valentine scrip was in 1927. The Secretary of the Interior ruled that under those circumstances, the 1918 withdrawal for public use having been made prior to selection although after issuance of the scrip, the selection was ineffective since the island was not at the time of the selection public land subject to disposition under the public land laws. This Court of Appeals held that this ruling of the Secretary was discretionary and not controllable by mandamus.

44. The pertinent terms of Executive Order No. 6910 of November 26, 1934 are stated in footnote 4.

retary's construction of the law was either arbitrary or capricious.

Consideration of the principal contentions made by West Coast and the Secretary, respectively, and of the authorities, statutory and judicial, principally relied upon by them, all as above set forth, makes clear, we think, that the decisions of the Supreme Court in Chotard v. Pope, Ivanhoe Mining Company v. Keystone Consolidated Mining Company, and United States v. Sweet, supra, and also the (withdrawal) Act of March 2, 1889 and the Executive Order (of withdrawal) No. 6910 of November 26, 1934, are, in view of the undisputed facts in this case, conclusive against the assertions of West Coast that the Secretary in rejecting the application of West Coast for a patent to Little Placer was acting beyond or in want of statutory power. It seems clear in view of the decisions referred to and of the Act and of the Executive Order of withdrawal that, contrary to acting beyond or in want of statutory power, the Secretary, in disapproving the selection of Little Placer and in rejecting the application for a patent, was acting according to law. Thus we reach, by examining "the essential nature and effect of the proceeding, as it appears from the entire record" (see Mine Safety Appliances Co. v. Forrestal, 326 U.S. 371, 374, 66 S.Ct. 219, 221, 90 L.Ed. 140 (1945)), a conclusion contrary to that reached, on the preliminary jurisdictional question, by assuming, for the jurisdictional purpose only, the truth of the assertions of the complaint that the Secretary was acting beyond or in want of statutory authority. And this conclusion which we now reach is, in effect, the conclusion which the District Court reached in holding that the mandatory relief sought was not allowable—that is to say, the District Court decided that the Secretary was acting according to law in refusing the patent. It follows further not only that the mandatory relief sought by West Coast is not allowable but that the case, when "the essential nature and effect of the proceeding, as it appears from the entire record"

is examined, is one against the United States—for, since the Secretary was acting in refusing the patent to Little Placer within his statutory power, the thrust of the suit is really against the United States to compel it to issue to West Coast a patent for Little Placer.

### III

It remains only to determine what the final disposition of the case should be. In Northern Pacific Railway Co. v. State of North Dakota ex rel. Langer, 250 U.S. 135, 39 S.Ct. 502, 63 L.Ed. 897 (1919), wherein, as pointed out in the discussion of that case in Topic I of this opinion, the lower court (the Supreme Court of North Dakota) accepted as true the assertion of want of power in the Director General of Railroads to impose and enforce intrastate rates and considered the case and issued mandatory relief against the Director General but it was determined by the Supreme Court of the United States that the Director General did have power to impose and enforce the local rates and that therefore the United States was a necessary party and that the judgment below must be reversed, Chief Justice White, speaking for the Court, ruled as follows:

"It follows that the judgment below was erroneous. The relief afforded against the officer of the United States proceeded upon the basis that he was exerting a power not conferred by the statute, to the detriment of the rights and duties of the state authority, and was subject therefore to be restrained by state power within the limits of the statute. Upon the premise upon which it rests, that is, the unlawful acts of the officers, the proposition is undoubted, but in view of our conclusion that the acts of the officers complained of were authorized by the law of the United States, the question arises how far, that being established, it results that the suit was one against the United States over which there was no jurisdiction within the rulings in Belknap v. Schild, 161 U.S. 10, 16 S.Ct. 443, 40 L.Ed. 599; International Postal Supply Co. v. Bruce, 194 U.S. 601, 24 S.Ct. 820, 48 L.Ed. 1134; Louisiana v. McAdoo, 234 U.S. 627, 34 S.Ct. 938, 58 L.Ed. 1506; Minnesota v. Hitchcock, 185 U.S. 373, 22 S.Ct. 650, 46 L.Ed. 954; Wells v. Roper, 246 U.S. 335, 38 S.Ct. 317, 62 L.Ed. 755.

"The principle of these cases, however, can only be applicable *by giving effect to the conclusion we have reached as to the legality of the acts of the officers* which were complained of, and to decide which question the United

States was not a necessary party. This is undoubtedly true unless it can be said that the contentions concerning the want of power in the officers were so unsubstantial and frivolous as to afford no basis for jurisdiction and hence caused the suit to be from the beginning directly against the United States. As, however, we are of the opinion that there is no ground for that view, it follows that *the case as made gave jurisdiction to dispose of the question of wrong committed by the officials*, and that a decree giving effect to our conclusion on that subject will dispose of the entire case.

"Our decree therefore must be and it is

"*Reverse and remand for further proceedings not inconsistent with this opinion.*" (250 U.S. at 151–152, 39 S.Ct. at 506.) (Emphasis supplied.)

In the District Court in the instant case, as explained at the outset of Topic I of this opinion, no question as to jurisdiction to entertain the action was raised. Nevertheless, the decision of the District Court—that in rejecting the selection of Little Placer and refusing to issue a patent thereto the Secretary was acting according to law and that therefore the mandatory relief sought by West Coast was not allowable—is, in effect, a decision upon the very question as to the power or want of power in the Secretary upon which this Court of Appeals is ruling in determining whether or not the suit, in "the essential nature and effect of the proceeding," is one against the United States; and the decision of the District Court is, as pointed out above, *in accord* with the conclusion which this court reaches on that question. Therefore, in the light of the statement by Mr. Chief Justice White there would seem to be warrant for allowing the

decision of the District Court in the instant case to stand. But, notwithstanding that the proposition stated by Mr. Chief Justice White has never, it appears, been expressly overruled by the Supreme Court,[45] the practice of that Court, in cases in which it has ultimately been determined by that Court that there was in the District Court or Circuit Court of Appeals a lack of jurisdiction over either the class of case involved or over a necessary party, has been to remand and direct a dismissal of the action for lack of jurisdiction, or, if the decision below was a dismissal for lack of jurisdiction, to affirm that dismissal. Mine Safety Appliances Co. v. Forrestal, 326 U.S. 371, 66 S.Ct. 219, 90 L.Ed. 140 (1945); Ford Motor Co. v. Dept. of Treasury, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945); Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944); Piedmont & Nor. Ry. Co. v. United States, 280 U.S. 469, 50 S.Ct. 192, 74 L.Ed. 551 (1930); Gnerich v. Rutter, 265 U.S. 388, 44 S. Ct. 532, 68 L.Ed. 1068 (1924); Lambert Run Coal Co. v. Baltimore & Ohio R. R. Co., 258 U.S. 377, 42 S.Ct. 349, 66 L.Ed. 671 (1922); see also a decision of the Supreme Court rendered prior to the decision in the Northern Pacific case, to wit, Wells v. Roper, 246 U.S. 335, 38 S. Ct. 317, 62 L.Ed. 755 (1918); the United States Court of Appeals for the Second Circuit has also followed the practice of the Supreme Court, Transcontinental & Western Air v. Farley, 2 Cir., 71 F.2d 288 (1934).[46]

45. The proposition could hardly be overruled, since a court has jurisdiction to determine its jurisdiction—see United States v. United Mine Workers, 330 U. S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947) —and therefore to decide the questions necessarily incident to that determination.

46. In Mine Safety Appliances Co. v. Forrestal it was asserted that Forrestal was without power, because of the unconstitutionality of the Renegotiation Act, to withhold moneys as excessive profits. The District Court for the District of Columbia dismissed the complaint on the ground that the suit was one against the United States which had not consented

to be sued. The Supreme Court, on examining "the essential nature and effect of the proceeding, as it appears from the entire record," reached the conclusion that the suit was really one, though nominally against the officer, actually against the Government to collect an alleged debt, and the Court therefore affirmed a dismissal for lack of jurisdiction.

In Ford Motor Co. v. Dept. of Treasury, a suit brought against a state agency and state officials to recover state taxes allegedly illegally collected, the District Court for the Southern District of Indiana denied recovery on the merits and the Circuit Court of Appeals for the Seventh Circuit affirmed. 141 F.2d 24. The

In view of the foregoing, we conclude that the case should be remanded to the District Court with directions to dismiss for lack of jurisdiction.

Remanded with directions to dismiss for lack of jurisdiction.

PRETTYMAN, Circuit Judge, with whom BAZELON, Circuit Judge, joins: Judge BAZELON and I agree with the opinion by Chief Judge STEPHENS, but, since we reached by a somewhat different route the conclusion reached by our brethren, we state our views.

The averments which constituted the foundation for the prayer of the complaint were that the Secretary's rejection of petitioner's claim for a patent was an arbitrary act in that it curtailed the rights of "a Congressional donee", substituted his (the Secretary's) judgment "for the will of Congress", and "re-

Supreme Court, ruling that the suit was one against the State of Indiana which had not consented to be sued in a federal district court, vacated the judgment of the Court of Appeals and remanded the cause to the District Court with directions to dismiss the complaint for want of consent by the state to the suit.

In Great Northern Ins. Co. v. Read, a suit against the Oklahoma Insurance Commissioner in the District Court for the Western District of Oklahoma to recover state taxes, upon the premiums of a foreign insurance company, which were allegedly discriminatory under the Fourteenth Amendment as compared with the taxation of domestic companies, and also allegedly unconstitutional as levied after the foreign company's admission to the state and upon premiums collected during the business year for which a license was already in force, the District Court refused recovery, apparently on the merits, and this was affirmed in the Circuit Court of Appeals for the Tenth Circuit. 136 F.2d 44. In the Supreme Court, where it was held that the suit was one against the State of Oklahoma and not maintainable in the federal courts without its consent, the judgment of the Circuit Court of Appeals was vacated and the cause remanded to the District Court with directions to dismiss the complaint for want of jurisdiction.

In Piedmont & Nor. Ry. Co. v. United States suit was instituted in a three-judge federal court under the Urgent Deficiencies Act for a declaratory judgment against the Interstate Commerce Commission that the railway was within an exemption from the Transportation Act of 1920 and was therefore not required to obtain a certificate of public necessity and convenience in order to extend its line. The suit was dismissed on the merits by the District Court. At the time of the suit the Federal Declaratory Judgment Act had not been enacted. The Supreme Court reversed with directions to dismiss the bill for want of jurisdiction.

In Gnerich v. Rutter, a suit to enjoin the Federal Prohibition Director for California from giving effect to a particular license restriction upon a licensed pharmacist, embodied in a permit issued under the National Prohibition Act, was filed in the United States District Court for the Northern District of California. That court dismissed the action on the ground that the bill stated no cause. The Circuit Court of Appeals for the Ninth Circuit, Gnerich v. Yellowley, 277 F. 632, affirmed on the ground that the suit could not be maintained without making the Commissioner of Internal Revenue a party defendant. The Supreme Court ruled that although it agreed with the Circuit Court of Appeals nevertheless the decree of the District Court should not have been affirmed; that the decree was on the merits, and that as it was given in the absence of a necessary party it should not have been permitted to stand. Therefore the decree was reversed with directions to dismiss the bill for want of a necessary party.

In Lambert Run Coal Co. v. Baltimore & Ohio R. R. Co., a suit commenced in a West Virginia state court but removed to the District Court for the Northern District of West Virginia, a single United States district judge entertained jurisdiction of the action as one against the Baltimore & Ohio R. R. Co. for distributing cars in accordance with its own rules rather than within those of the Interstate Commerce Commission. The district judge refused to dismiss and issued an interlocutory injunction. On appeal the Circuit Court of Appeals for the Fourth Circuit, 267 F. 776 ruled that the car distribution rule was that prescribed by the Commission and that the bill should therefore have been dismissed on the merits, also that since the relief sought was against the Commission it could be granted only by a three-judge court. In the Supreme Court it was ruled that while the decree of the District Court was properly reversed the Circuit Court of Appeals had no occasion to pass upon

fused to discharge a mandatory and purely ministerial duty imposed by law." The prayer was that the court direct the Secretary to issue a patent to the parcel of land selected by petitioner and known in this litigation as Little Placer. Thus the theory of petitioner's case is that Congress had exercised the full power of the sovereign United States in respect to this land and left to the Secretary of the Interior only the ministerial act of preparing, executing and delivering the necessary documents constituting the legal formality essential to title transfer.

Until it appeared that the basic averments could not be maintained, the court had jurisdiction to entertain the action.[1] If petitioner were to establish its propositions, if it were indeed a Congressional donee, if Congress had exercised its will and directed the patent to issue, and if the Secretary had only a purely ministerial duty to execute the papers, *mandamus* would issue. Many cases, beginning with Marbury v. Madison [2] and extending in a long, unbroken line down to Higginson v. Schoeneman [3] in this court, establish that courts have power to compel an executive officer to perform a merely ministerial act which the Congress has directed him to perform.[4] That rule has been applied in a great variety of cases, including some which

the merits of the controversy and that its direction should have been to dismiss the bill for want of jurisdiction and without prejudice, since the United States was an indispensable party and not joined and since it could not be joined because it had not consented to be sued in state courts.

In Wells v. Roper, an injunction suit brought in the then Supreme Court of the District of Columbia upon the theory that the Assistant Postmaster General was acting beyond his power in canceling a contract, the Supreme Court of the District, and on appeal the then Court of Appeals for the District, dismissed the bill upon the ground that the suit was essentially one against the United States and therefore beyond the jurisdiction of the court. The Supreme Court of the United States concurred on the ground that the officer charged was acting within his power. The decree below was affirmed.

In Transcontinental & Western Air v. Farley, where, as pointed out in the discussion of that case in Topic I of this opinion, the assertion was that Farley, Postmaster General, was without power to cancel air mail contracts which had been entered into between the United States and the complainant, the suit was in the United States District Court for the Southern District of New York for specific performance of the contract. The District Court issued an order to show cause why Farley should not be restrained, pending the hearing and determination of the cause, from enforcing the cancellation order. But on the return to the order to show cause the District Court denied a preliminary injunction and entered a decree that the complaint be in all respects dismissed; the dismissal was apparently upon the merits. The Circuit Court of Appeals for the Second Circuit ruled that since Farley was allegedly without power to cancel the contracts the suit was one against the United States on standing contracts and therefore the Government was a necessary party. The Court of Appeals therefore ruled that the decree must be reversed and a decree entered dismissing the bill for lack of jurisdiction.

1. Lambert Run Coal Co. v. Baltimore & Ohio R. R. Co., 258 U.S. 377, 383, 42 S. Ct. 349, 66 L.Ed. 671 (1922); Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); American Dredging Co. v. Cochrane, 89 U.S.App.D.C. 88, 190 F.2d 106 (1951).

2. 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803).

3. 89 U.S.App.D.C. 126, 190 F.2d 32 (1951).

4. Roberts v. United States ex rel. Valentine, 176 U.S. 221, 20 S.Ct. 376, 44 L.Ed. 443 (1900); Lane v. Hoglund, 244 U.S. 174, 37 S.Ct. 558, 61 L.Ed. 1066 (1917); Work v. United States ex rel. McAlester, etc., Co., 262 U.S. 200, 43 S.Ct. 580, 67 L. Ed. 949 (1923); Wilbur v. United States ex rel. Krushnic, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930); Ballinger v. United States ex rel. Frost, 216 U.S. 240, 30 S.Ct. 338, 54 L.Ed. 464 (1910). See also discussion in Noble v. Union River Logging R. Co., 147 U.S. 165, 13 S.Ct. 271, 37 L.Ed. 123 (1893); Work v. United States ex rel. Rives, 267 U.S. 175, 45 S. Ct. 252, 69 L.Ed. 561 (1925). The long line of other cases establishing this rule can be located easily in the digests and text-books.

involved land of the United States,[5] payments out of the Treasury of the United States,[6] and other similar matters in respect to which courts have no general power.

The averments of petitioner were premised squarely upon the terms of the Gerard Act. But the Gerard Act is not as petitioner views it. The right given by Congress to the Gerard heirs was to "enter" the land. The word "enter" in public land law is a technical word, describing the filing of proper papers, with descriptions, claims, etc., in the proper official office.[7] The term is the key used in the homestead and preemption statutes.[8]

The right to "enter" public lands has always been subject to the provision that the lands be available for entry at the time the entry is attempted. So, if the land has already been appropriated[9] or withdrawn[10] it is no longer subject to entry.[11]

In 1947, when West Coast attempted to enter the public land known as Little Placer, that land had been withdrawn from entry. It was mineral land in California. As such it was covered by the Mineral Leasing Act,[12] by Executive Order No. 6910 of November 26, 1934,[13] and by the rule in the Ivanhoe case.[14]

The sum of the situation therefore is that, no matter what the rights of the original Gerard heirs might have been in 1855, they stood by and watched the lands to which their right of entry would have applied dwindle away, and when in 1947 they finally attempted an entry they selected land no longer available. This land, Little Placer, was at that time part of the general public lands of the United States not open to entry.

Upon consideration of these matters it clearly appears that the Secretary had no ministerial duty to execute a patent to this piece of land; the averments which constitute the foundation for the prayer of the complaint cannot be maintained.

So it develops, when the complaint is considered, that the prayer of petitioner for a transfer of the ownership of Little Placer is a prayer that the court compel action by the owner of the land. But the owner is the United States, and a court has no jurisdiction to compel the United States to part with its property. A court can compel an agent of the United States to do his principal's bidding

5. Work v. United States ex rel. McAlester, etc., Co., supra note 4; Lane v. Hoglund, supra note 4; Ballinger v. United States ex rel. Frost, supra note 4. See also Simmons v. Wagner, 101 U.S. 260, 25 L.Ed. 910 (1880); United States v. Schurz, 102 U.S. 378, 26 L.Ed. 167 (1880); Barney v. Dolph, 97 U.S. 652, 24 L.Ed. 1063 (1878).

6. Roberts v. United States ex rel. Valentine, supra note 4; Work v. United States ex rel. Lynn, 266 U.S. 161, 45 S.Ct. 39, 69 L.Ed. 223 (1924); Miguel v. McCarl, 291 U.S. 442, 54 S.Ct. 465, 78 L.Ed. 901 (1934); Higginson v. Schoeneman, supra; Smith v. Jackson, 241 F. 747 (5th Cir.1917), affirmed 246 U.S. 388, 38 S.Ct. 353, 62 L.Ed. 788 (1918).

7. See Chotard v. Pope, 12 Wheat. 586, 25 U.S. 586, 6 L.Ed. 737 (1827); Buxton v. Traver, 130 U.S. 232, 9 S.Ct. 509, 32 L. Ed. 920 (1889); Northern Pacific Ry. v. De Lacey, 174 U.S. 622, 19 S.Ct. 791, 43 L.Ed. 1111 (1899); Eldred v. Sexton,

19 Wall. 189, 86 U.S. 189, 22 L.Ed. 146 (1874).

8. See 43 U.S.C.A. § 162 et seq.

9. Hastings and Dakota R. R. Co. v. Whitney, 132 U.S. 357, 10 S.Ct. 112, 33 L. Ed. 363 (1889); Simmons v. Wagner, supra note 5.

10. See United States v. New Orleans P. Ry. Co., 248 U.S. 507, 39 S.Ct. 175, 63 L.Ed. 388 (1919); United States v. Midwest Oil Co., 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673 (1915); Sioux Tribe v. United States, 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942).

11. Lyders v. Ickes, 65 App.D.C. 379, 84 F. 2d 232 (1936).

12. 41 Stat. 437 (1920), 30 U.S.C.A. §§ 22, 48, 171, 181 et seq., 201 et seq.

13. 43 Code Fed.Regs. § 297.11 (1949).

14. Ivanhoe Mining Co. v. Keystone Consolidated Mining Co., 102 U.S. 167, 26 L. Ed. 126 (1880).

as that bidding is declared by the Congress on behalf of the United States. Under the Constitution [15] the Congress possesses the sovereign power of the United States in respect to property of the United States. The courts cannot compel the United States as such to act. Absent a Congressional directive they cannot compel an agent of the United States to act in respect to its property.

Since the court has no power to make the owner of the property (the United States) a party to the action, the case should be dismissed for lack of a necessary party and, therefore, lack of jurisdiction to enter judgment. The correct course of action was clearly described by Mr. Justice Brandeis in Lambert Run Coal Co. v. Baltimore & Ohio R. R. Co.[16] and was followed by this court in American Dredging Co. v. Cochrane.[17]

WASHINGTON, Circuit Judge, with whom EDGERTON, Circuit Judge, joins, concurring in the result: We adhere to the views expressed in Seiden v. Larson, 88 U.S.App.D.C. 258, 188 F.2d 661, certiorari denied, 341 U.S. 950, 71 S.Ct. 1017, 95 L.Ed. 1373 (1951). Those views were based on a long series of Supreme Court cases, there cited, culminating in Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). See also American Dredging Co. v. Cochrane, 89 U.S.App. D.C. 88, 190 F.2d 106 (1951); Young v. Anderson, 81 U.S.App.D.C. 379, 160 F.2d 225, certiorari denied, 331 U.S. 824, 67 S.Ct. 1316, 91 L.Ed. 1840 (1949); Ickes v. Underwood, 78 U.S.App.D.C. 396, 398–99, 141 F.2d 546, 548–49 (1944). Where the complaint, read favorably to the pleader, discloses that the suit is within the rule stated in the foregoing line of authority, in that it seeks to obtain possession of and title to "unquestionably sovereign property", Larson v. Domestic & Foreign Commerce Corp., supra, 337 U.S. at 691, note 11, 69 S.Ct. at 1462, and where Congress has not con-

sented to the suit, dismissal for lack of jurisdiction must follow. This is such a case. There is thus no occasion to consider the merits, even to the extent normally required in a mandamus action. Goldberg v. Daniels, 231 U.S. 218, at 222, 34 S.Ct. 84, 58 L.Ed. 191 (1913).

FAHY, Circuit Judge, concurring in the result: Plainly, it seems to me, the suit in reality is one against the United States to which it has not consented and, therefore, should be dismissed in the District Court for want of jurisdiction.

Since Seiden v. Larson, 88 U.S.App. D.C. 258, 188 F.2d 661, was also such a suit, and this court so held, there seems no reason to overrule any part of that decision.

---

**15.** Art. IV, § 3, cl. 2.

**16.** Supra note 1, 258 U.S. at 383, 42 S.Ct. at 351.

**17.** Supra note 1.